STATOM ET AL. *v.* BOARD OF COMMISSIONERS
OF PRINCE GEORGE'S COUNTY ET AL.

[No. 59, September Term, 1963.]

58

*Decided November 14, 1963.*

The cause was argued before BRUNE, C. J., and HAMMOND, PRESCOTT, HORNEY and SYBERT, JJ.

*Isaac N. Groner,* for appellants.

*William A. Ehrmantraut,* with whom were *Edward C. Donahue, John J. Mitchell, Lionell M. Lockhart, Paul Nussbaum* and *Richard V. Waldron* on the brief, for appellees.

PRESCOTT, J., delivered the opinion of the Court.

After the Circuit Court for Prince George's County sustained demurrers to, and dismissed, their amended bill of complaint (the bill), by which they sought to enjoin the use of certain public facilities by the Prince George's County Boys' Club (Club), until the Club should admit Negro boys to a non-segregated participation in its activities, the plaintiffs below, in a class suit, have appealed.

The question presented is whether the well-pleaded allegations of the bill set forth a denial by the appellees, or any of them, of the constitutional rights of the appellants to equal protection of the laws, as guaranteed to all citizens by the Fourteenth Amendment to the United States Constitution, and Article 2 of the Maryland Declaration of Rights.

The bill, in substance, alleges that the plaintiffs are boys of the Negro race, who are eligible by age, health, character, interest in athletics, and similar and legitimate qualifications, for membership and activity, together with, and on the same basis as, boys of the Caucasian and other races, in the sports and on the teams promoted and sponsored by the Club. The number of boys in the same class as plaintiffs, eligible for membership and activity in the Club, but barred from membership or participation on an integrated basis solely because of their color, is too large practicably to bring before the Court. Therefore plaintiffs sue on behalf of all the members of said class as well as themselves.

Defendant, Board of County Commissioners of Prince George's County is a governmental body, and is responsible, under the laws of the State of Maryland, for the use of the pub-

lic resources and facilities, including public buildings and school premises and property, of the County. Defendant, Board of Education of the County, is a governmental body, and is responsible, under the laws of the State and the laws and ordinances of the County, for the maintenance and use in the County of public school premises and property. The bill then names the individual defendants constituting said Boards. Defendant, William H. Schmidt, is the Superintendent of Schools of the County, and is responsible for the maintenance and use of the public school premises and property of the County.

Defendant, Mayor and Council of the Town of Cheverly (Town), is a public body existing under and by virtue of the laws of Maryland. The bill then names the individual defendants constituting the Mayor and Council, and alleges that defendant Harris is responsible for the use of the parks of the Town.

Defendant, Club, is a membership corporation organized and operated by virtue of the laws of Maryland, and, in general, is devoted to providing a properly supervised boys' athletic and guidance program by sponsoring town teams, games and competition, during at least the baseball, football and basketball seasons, and in other ways promoting the welfare of the boys of the County. In its activity and functioning the Club serves a public function and purpose, namely, recreation and youth guidance. Defendant, Joseph W. Vernon, is the Executive Director of the Club, a full-time, paid position. The office of Vernon is located on and in public property, the County Service Building located in Hyattsville, Maryland. It is made available without the payment of rent, or for utilities, for maintenance or for similar costs or expenses to the County; and the use thereof is with the knowledge and consent of the Commissioners and each individual member thereof.

The Club makes use of the playgrounds, premises, and property of the County public schools for the practice and competitive games of its players, teams and leagues, and related and other uses and activities. Such use by the Club is with the knowledge, permission and approval of each and all the defendant public officials heretofore alleged to be charged with the duty of controlling and caring for said playgrounds, premises,

and property, as well as the other defendants. The Club makes use, with the knowledge of the officials of the Town, of the public park of the Town for the practice and competitive games of its players, teams and leagues, and related and other uses and activities.

On or about May 13, 1961, plaintiffs were solicited for membership in the Club, and received membership application forms, within or on the premises or grounds of the Tuxedo-Cheverly School, (plaintiffs being students therein) a public school in the Town, but operated by the County. On information and belief, each and all the defendants were officially and actually aware of, and the public-official defendants sanctioned and approved of, the use of the public school premises and grounds for this purpose of the Club's distributing information about itself and soliciting members. Shortly thereafter, plaintiffs and their parents completed the application blanks, submitted them with the requisite fees, which fees have never been returned, and seemed to have been accepted for membership in the Club. Thereafter, they practiced and played baseball on an integrated basis on a team or teams of the Club, without discord, incident, or question.

On or about June 8, 1961, however, plaintiffs were prevented from continuing to play on said team or teams. Defendants Club and Vernon officially advised them that the Club policy was racial segregation, so that they would never be permitted to play on any of the Club team or teams on an integrated basis, at any time, in any sport or activity, solely because they were Negroes.

Plaintiffs have made efforts to be accepted as members of the Club, and have made repeated requests and demands of defendants without avail, that they cease their course of conduct, that either the Club cease its policy of segregation and discrimination and admit plaintiffs and permit them to participate fully and on the same basis as boys of the Caucasian race, or that the Club be denied the use of the County Service Building, the County public school playgrounds, premises and property, and the Town park, and any other public property, resource or facility for its offices, for the play or practice of any of its players, teams or leagues, or for any other Club purpose

or activity, until and unless the Club shall admit plaintiffs to equal and integrated membership and participation. And unless enjoined, each and all of the defendants will continue to permit the use, or use, public property, resources and facilities for Club purposes and activities, as alleged in the bill, unlawfully and unconstitutionally.

The bill further alleges that as citizens of the United States and of Maryland, plaintiffs are entitled, and have been entitled throughout the times referred to therein, to use public property, resources and facilities, and to have public property, resources and facilities used, on the basis of equality of rights, privileges, and immunities of the various races; and plaintiffs have, and have had throughout the times referred to therein, the right, privilege and immunity not to be segregated or discriminated against by public officers, groups, or agencies, or private individuals, institutions, corporations, or other groups acting in concert with or as beneficiaries of public officers, groups, or agencies, making use of public property, resources or facilities in practicing such unlawful and unconstitutional discrimination and segregation.

The bill prays that the public-official defendants be enjoined "from directly or indirectly permitting, approving or sanctioning the use" by the Club of any public property, "unless and until said Club shall admit plaintiffs and all others eligible except for said policy of racial segregation and discrimination into membership and participation on a full, equal and integrated basis"; and until such time, the Club and Vernon be enjoined from using said public property.

The Fourteenth Amendment, *inter alia,* provides that, "no *State* shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any *State* * * * deny to any person within its jurisdiction the equal protection of the laws." (Emphasis added.) Hence it is seen that the Amendment inhibits State action, but it does not proscribe private or individual conduct, even though such conduct be discriminatory, wrongful, arbitrary or capricious. *Civil Rights Cases,* 109 U. S. 3 (1883); *Shelley v. Kraemer,* 334 U. S. 1 (1948); *Burton v. Wilmington Pkg. Auth.,* 365

U. S. 715 (1961); *Peterson v. Greenville,* 373 U. S. 244 (1963).

The appellees argue that the Club is a purely private, non-profit corporation, whose affairs and operations are conducted by private individuals without State interference or supervision; consequently the conduct of the Club does not fall within the purview of the action prohibited by the Amendment. The bill does not allege that the Club is a public corporation; therefore we may safely assume it to be a private one. But, in order to determine whether this, alone, answers our question and is the sole test to be applied to appellees' activities to determine their validity from a constitutional viewpoint, it is necessary that we examine the decisions of the Supreme Court of the United States, whose rulings on federal constitutional questions are binding on this and all of the other States in the Union.

Before taking up the Supreme Court decisions, we shall discuss, briefly, several cases decided in the lower Federal Courts, some of which we find difficult to reconcile completely with the holdings of the Supreme Court. In *Mitchell v. Boys Club of Metropolitan Police, D. C.,* 157 F. Supp. 101 (U.S. D.C., D.C. [1957]), a case very similar on its facts to the case at bar, it was held that the boys' club therein involved was a purely private corporation; that the use by the Club of District of Columbia facilities, the active participation of paid District police in the Club's activites, and the solicitation of funds for the Club did not change the character of the Club to that of a public corporation; and that government *control* is decisive in determining whether a corporation is private or public. The court concluded that since the boys' club was a private corporation, the practice of racial segregation therein did not violate the Fifth Amendment (the Fourteenth Amendment, of course, applies only to the States).

In *Wood v. Hogan,* 215 F. Supp. 53 (W.D. Va., 1963), after suit had been instituted against the Administrator of the Lynchburg General Hospital and the Hospital Authority of that City seeking to end racial segregation, the Authority was dissolved and all of its assets, including its hospital, were turned over to a newly-organized, non-profit, charitable corporation,

64

with a self-perpetuating board of trustees, who, initially, were the same persons as constituted the last board of directors of the Authority. The original cost of the hospital building was defrayed in part by contributions of the United States under the Hill-Burton Act, 42 U.S.C. § 291 *et seq.* (this Act permits segregation under certain conditions), and by contributions of the City of Lynchburg. It was held that the new corporation was private in nature; hence its activities were not amenable to the Fourteenth Amendment.

On the contrary, see the cases of *Department of Conservation and Development v. Tate,* 231 F. 2d 615 (C.A. 4), *Derrington v. Plummer,* 240 F. 2d 922 (C.A. 5), and *Hampton v. City of Jacksonville, Florida,* 304 F. 2d 320 (C.A. 5, 1962), wherein it was held, respectively, that Negroes were entitled to an injunction to prevent the lease of a public park, unless the lease operated so as not to discriminate against the members of any race; that a county was properly enjoined from extending a lease of a courthouse cafeteria to a tenant who would exclude therefrom persons merely because they were Negroes; and that a Negro plaintiff was entitled to an injunction against a city and the purchasers of its golf courses from restricting the use of the courses to white patrons (stress was laid in this case on a reverter clause in the deed). These are but a few of the many Federal cases dealing with the subject under discussion and related matters.

We turn now to a consideration of the Supreme Court cases. In the *Civil Rights Cases, supra,* the Supreme Court made it plain that the State action inhibited by the Amendment was "State action of every kind" which is inconsistent with the guaranties therein contained, and extends to manifestations of "state authority in the shape of laws, customs, or judicial or executive proceedings." See also *Brinkerhoff-Faris Trust & Savings Co. v. Hill,* 281 U. S. 673, 680 (1930) ; *Shelley v. Kraemer, supra.* And it makes no difference whatever guise the State action takes. *Cooper v. Aaron,* 358 U. S. 1, 16 (1958) ; 240 F. 2d 922. In *Cooper v. Aaron, supra,* it was stated, "the situation here is in no different posture because the members of the School Board and the Superintendent of Schools are local officials; from the point of view of the Fourteenth Amendment,

they stand in this litigation as the agents of the State." The Court continued, quoting from *Ex parte Virginia,* 100 U. S. 339, "The [Fourteenth Amendment] * * * must mean that no agency of the State, or of the officers or agents by whom its powers are exerted, shall deny to any person * * * the equal protection of the laws."

Some very pertinent language was used in the recent case of *Burton v. Wilmington Pky. Auth., supra.* There, the Parking Authority, an agency of the State, owned and operated a parking building. The Authority leased a portion of this building to a private corporation for a restaurant which refused to serve the appellant solely because he was a Negro. The Supreme Court of Delaware held, *inter alia,* that the lessee was acting in "a purely private capacity" and therefore its discrimination was legal.

The Supreme Court quoted from *Cooper v. Aaron, supra,* in pointing out that the concept of state responsibility was interpreted as necessarily following upon "state participation through any *arrangement,* management, *funds* or *property."* (Italics supplied.) The opinion again stated the proposition that private conduct, which abridges "individual rights," does no violence to the Equal Protection Clause, unless "to some significant extent the State in any of its manifestations has been found to have become involved in it." Continuing, the opinion indicated that the question of state involvement should be determined by the facts and attendant circumstances in each case, and stated "only by sifting facts and weighing circumstances can the non-obvious involvement of the State in private conduct be attributed its true significance." The Court reversed and stated that when a State leases public property in the manner and for the purpose as shown in that case, the prohibitions of the Equal Protection Clause must be complied with by the lessee. See also *Turner v. City of Memphis,* 369 U. S. 350 (1962), wherein a private corporation, which leased a restaurant from a city at its municipal airport, was enjoined from practicing racial discrimination. And compare *Peterson v. Greenville,* 373 U. S. 244 (1963).

These and other Supreme Court decisions make it certain that any state policy fostering segregation in publicly operated

facilities cannot stand consistently with the Equal Protection Clause. *Turner v. City of Memphis, supra; Brown v. Board of Education,* 347 U. S. 483; *Mayor & City Council v. Dawson,* 350 U. S. 877; *Holmes v. City of Atlanta,* 350 U. S. 879. And it no longer can be doubted that purely private organizations, which, ordinarily, conduct purely private activities, may voluntarily associate themselves with the State in such a manner as to make that organization, in its activities, fall within the aegis of the Fourteenth Amendment. *Hampton v. City of Jacksonville, Florida,* 304 F. 2d 320 (C. A. 5), (the conduct of a golf course); *Burton v. Wilmington Pky. Auth., supra,* (a restaurant); *Kerr v. Enoch Pratt Free Library,* 149 F. 2d 212 (C. A. 4), (a library); *Turner v. City of Memphis, supra,* (another restaurant). Thus, it is seen that the fact that the Club in the case at bar is a private corporation is not the sole *sine qua non* to insure its insulation from unconstitutional discrimination.

This brings us to a consideration of the allegations of the bill. As we read them, they allege that agents and agencies of the State are, and for some time, have been furnishing, without charge, office space for the Executive Director of the Club; they (the agents and agencies of the State) permit, knowingly, systematically and habitually, the use of their public school buildings to solicit, on a segregated basis, membership in the Club;[1] and they, knowingly, systematically and habitually, permit, without charge, the use of publicly owned school playgrounds and facilities by the Club on a segregated basis. We think these allegations state "manifestations" by the State, through "arrangements," "funds" and "property," sufficient to show that the State "to some significant extent" has become involved in the conduct and operation of the Club, which brings the operation thereof as presently carried on within the ambit of conduct proscribed by the Equal Protection Clause. The cost of public buildings, school buildings, schoolhouses and playgrounds are paid from public funds and such buildings and playgrounds may not, systematically and habitually (as distinguished from an occasional

---

1. These two allegations do not apply to the Town of Cheverly and its officials.

or casual use), be utilized, or permitted to be utilized, on a basis of racial discrimination.[2] In *Burton* and *Turner*, both *supra*, the *leasing* of public property to a private corporation and an individual (in both cases the State became "involved"), who attempted to operate restaurants on a segregated basis, was condemned. It is suggested that in the case at bar there was no *leasing*, but a *donation*, or *permitting the use* of public property, and this makes the cases distinguishable. In our opinion, the case at bar comes more clearly within the provisions of the Equal Protection Clause than either *Burton* or *Turner*. Certainly it would be most illogical to hold that public officials can not *lease* public property for an unconstitutional use, but that they may *donate* it, or *permit its use*, for an unconstitutional purpose. We hold that the demurrers should have been overruled.

We do not wish the above ruling to be interpreted as a holding that every organization or association which occasionally or casually uses, or is permitted to use, public property must be conducted on a nonsegregated basis. We find nothing in the cases cited that requires such a holding. We stated above that the Equal Protection Clause inhibits State action, but it does not prohibit the practice of segregation by private associations. Such conduct by a private association is only prohibited when the State "to some significant extent * * * has been found to have become involved in it." A mere casual or occasional use of, or permission to use, public facilities by a private organization does not "involve" the State in the conduct and affairs of the organization to such "significant extent" as to require the private organization to operate on a nonsegregated basis.

> *Order sustaining the demurrers reversed and cause remanded for further proceedings not inconsistent with this opinion. Costs to be paid by the appellees.*

---

**2.** Appellees cite Code (1957), Article 77, §§ 80, 82, which permit groups of citizens to use school buildings and grounds for civic, social and recreational activities so long as that use does not interfere with the principal purposes of those facilities. However, the statutes cannot permit an unconstitutional use. Turner v. City of Memphis, supra.