**Vincent Leonard SMITH et al., Plaintiffs,**

**v.**

**The YOUNG MEN'S CHRISTIAN ASSOCIATION OF MONTGOMERY, Inc., a non-profit Alabama Corporation, et al., Defendants.**

**Civ. A. No. 2883-N.**

United States District Court,
M. D. Alabama, N. D.

July 20, 1970.

Morris S. Dees, Jr., and Fred Gray, Gray, Seay & Langford, Montgomery, Ala., for plaintiffs.

Roland Nachman, Steiner, Crum & Baker, and Oakley Melton, Jr., Montgomery, Ala., for defendants.

## OPINION

JOHNSON, Chief Judge.

The individual plaintiffs, who bring this action for the benefit of themselves and other members of their class who are similarly situated, allege in their complaint that they were denied membership in defendants' summer day camp program solely because they are Negroes. They further contend that: (1) defendant Young Men's Christian Association (hereinafter referred to as YMCA), acting through its officers and employees, has engaged in and continues to engage in a pattern and practice of racial discrimination by fostering and maintaining segregated branches and by excluding Negroes from many of the organization's recreational and educational activities; and (2) defendants' discriminatory conduct violates the Constitution and laws of the United States. Plaintiffs seek a preliminary and a permanent injunction, prohibiting defendant YMCA from operating any of its branches or administering any of its programs in a racially discriminatory manner and ordering defendant to take whatever affirmative action is necessary to remedy the effects of its past discrimination.

This action is authorized under 42 U.S.C. §§ 1981 and 1983 and the Civil Rights Act of 1964, 42 U.S.C. § 2000a et seq. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343(3) and (4).

During the first week of June, 1969, plaintiffs, accompanied by their respective mothers, went to the Central branch of the YMCA to submit their completed application forms for membership in Camp Belser. Upon their arrival, they were referred to defendant Chandler, Executive Director of the YMCA. He refused to accept their completed applica-

tions, stating that he had no authority to accept applications from Negroes and that he would have to refer the matter to the YMCA's Board of Directors. Chandler then told them that they would be notified within ten days of the Board's decision.

On June 11, 1969, plaintiffs filed with this Court their complaint for declaratory and injunctive relief. Ten days later, on June 21, defendant Chandler notified the plaintiffs by registered mail that they had been accepted as members in Camp Belser. On September 30, 1969, a hearing was held on plaintiffs' motion for a preliminary and a permanent injunction. The case is now submitted upon this motion, the response thereto by the defendants, the pleadings, depositions, oral testimony of witnesses taken before the Court, the exhibits to said testimony and the briefs and arguments of the parties.

## I

### BACKGROUND

Defendant YMCA of Montgomery, Inc., a nonprofit, tax-exempt organization incorporated under the laws of the State of Alabama, offers a variety of recreational, spiritual and educational programs and activities. It presently operates five branches [1] in the greater Montgomery area—Central, South, East, Cleveland Avenue, Prattville—and has a total membership of approximately 18,000. The Association also operates a Camp branch, which includes the two YMCA camps, Camp Belser and Camp Rotary. Membership is open to the general public, the only qualification being that the applicant be of "good moral character" and in sympathy with the aims and purposes of the organization.

Of the four YMCA branches located within the city of Montgomery, three are totally segregated by race. The South and East branches, which serve predominately white neighborhoods, have a total of 8,000 members, none of whom is a Negro. The Central branch, serving an extensively racially-mixed section of the city, also has an all-white membership. The fourth branch, Cleveland Avenue, serves a predominately Negro area; it has approximately 2,000 members, all but a few of whom are Negroes.

The YMCA's other two branches, Prattville and the Camp branch, also have all-white memberships. The Prattville branch has approximately 3,000 members, none of whom is black. At the time this suit was filed, neither Camp Belser, the day camp to which plaintiffs applied for membership, nor Camp Rotary, the overnight camp, had ever had a Negro member.[2] Furthermore, there has never been a Negro on the YMCA Board of Directors, the governing body of the organization.[3]

Since most of the activities offered by a particular branch are available only to its own members, the overwhelming majority of activities offered by the YMCA are totally segregated by race. The swimming programs at the South, East, Central and Prattville branches, for example, are all-white, while the swimming program at Cleveland Avenue is all-black. Even those programs, moreover, which are publicized as being open to the YMCA's general membership are rarely integrated. The Alabama Youth Legislature, for example, which is purported to be open to all YMCA Hi-Y members, had its first Negro participant in 1969 even though the Cleveland Avenue branch has, for a number of years, had an active Hi-Y program.

---

1. The YMCA also operates a "Southeast" extension which is under the management and direction of the South branch.

2. In July of 1969, approximately one month after this suit was filed, three Negro youths were accepted as members of Camp Belser. The boys attended for

a one-week period during the month of August.

3. This all-white board of directors of the Montgomery YMCA has never signed the HEW nondiscrimination compliance forms. Of the individual branches, only Cleveland Avenue has signed the compliance forms.

The above-described situation is exacerbated by the fact that the YMCA is the only agency in the city, public or private, to offer many of these activities. This monopoly results in part from a cooperative agreement entered into by the City of Montgomery and the YMCA back in 1958. At that time, a "Montgomery Park and Recreation Department —YMCA Co-ordination Committee" was established to co-ordinate the facilities and programs of the YMCA with those of the City "in order to eliminate any conflict or duplication of efforts."

This "Co-ordination Committee" formulated a two-part plan which was adopted and implemented by the City and the YMCA. First, the Recreation Department and the YMCA were to co-ordinate their various athletic programs so that both agencies would not be offering similar programs for the same age bracket. The YMCA, for example, was to supervise most of the athletic programs for all elementary school children in the city, while the Recreation Department was to offer the same programs for the city's junior high school students. Furthermore, since the City did not own or operate any swimming pools, the YMCA, which was in the process of constructing several new pools, was to administer the City's entire swimming program. Second, the YMCA branches were to co-ordinate their club programs and informal education classes with those of the city community centers in their neighborhood areas. Whenever a YMCA branch and community center were situated in the same school district, a member of the branch YMCA Board was to meet on a regular basis with a member of the Community Center Council to insure a co-ordination of efforts. This plan, which was reviewed by the committee in 1959 and again in 1965, is still in effect today.[4]

## II

The first question before the Court is whether the "case" and "controversy" requirement of Article III, Section 2 of the United States Constitution precludes it from deciding the merits of the case. Defendants argue that when plaintiffs received their notices of acceptance to Camp Belser, they were afforded all the relief to which they were entitled. Finding that this case is therefore moot as to the individual plaintiffs, defendants conclude that plaintiffs have no standing to attack an alleged practice of racial discrimination either on their own behalf or on behalf of the class they purport to represent. The Court finds these contentions to be wholly without merit.

Defendants, who originally refused to grant plaintiffs membership in Camp Belser, did not notify them of their acceptance until after this litigation had commenced. "Such actions in the face of litigation are equivocal in purpose, motive and permanence."[5] This post-suit change of heart, which is even more suspect in light of plaintiffs' prima facie showing of a long-standing practice of racial discrimination, strongly militates against a finding of mootness.[6]

Even if the individual plaintiffs were no longer entitled to personal relief, the other members of the class would still have standing to maintain this action. The rights of the class cannot be subverted by the granting of such belated and equivocal relief as was afforded the individual plaintiffs.[7] To allow the man-

4. In February of 1969, for example, defendant Chandler recommended to the Mayor that the YMCA operate the four new pools which the City and the local Housing Authority were planning to build.

5. Jenkins v. United Gas Corp., 400 F.2d 28, 33 (5th Cir. 1968); see Cypress v. Newport News Gen. Hosp., 375 F.2d 648, 658 (4th Cir. 1967) (*en banc*).

6. See Pullum v. Greene, 396 F.2d 251, 255–256 (5th Cir. 1968); Lankford v. Gelston, 364 F.2d 197, 202–203 (4th Cir. 1965); United States v. Atkins, 323 F.2d 733, 739–740 (5th Cir. 1963).

7. See Cypress v. Newport News Gen. Hosp., *supra*, 375 F.2d at 657; Buckner v. County School Bd., 332 F.2d 452, 454 (4th Cir. 1964).

dates of the Equal Protection Clause to be so easily circumvented would be for the Court to contribute actively to the alleged class discrimination.

### III

■ Count One of plaintiffs' complaint, in which they allege that defendant YMCA, in operating its branches and administering its activities in a racially segregated manner, has violated their constitutional rights under the Equal Protection Clause of the Fourteenth Amendment, is grounded on 42 U.S.C. § 1983.[8] To be entitled to relief under this section of the 1871 Civil Rights Act, plaintiffs must show two things. First, they must prove that the defendant deprived them of a right secured by the "Constitution and laws" of the United States. Second, they must show that the defendant was acting "'under color of law," that is, was acting "under color of any statute, ordinance, regulation, custom or usage, of any State or Territory." [9]

■ Defendants acknowledge that the Equal Protection Clause of the Fourteenth Amendment prohibits a state from operating its recreational and educational facilities on a segregated basis.[10] They contend, however, that the YMCA's segregated branches and activities result not from purposeful discrimination but rather from residential patterns and the proclivity of both whites and Negroes to keep with members of their own race.[11] Defendants argue, in the alternative, that even if their conduct has been discriminatory, the prohibitions of the Fourteenth Amendment apply only to the states and not to private citizens and organizations.

■ While geographical location has been an important factor in determining the racial composition of the South, East and Cleveland Avenue YMCAs, it does not explain the *total* segregation of these branches. Nor can it justify the all-white membership at the Central and Prattville branches, which are situated in interstitial areas. The facts of this case demonstrate, and this Court finds, that the segregated conditions at Camp Belser and the other YMCA branches have resulted primarily from the machinations and contrivances of the defendants, rather than from de facto or adventitious segregation.[12]

The YMCA, for example, established an assignment plan several years ago by which every school in the city of Montgomery was to be "assigned" to one of the four YMCA branches—supposedly

---

8. 42 U.S.C. § 1983 provides:
"Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

9. See e. g., Monroe v. Pape, 365 U.S. 167, 184, 187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); United States v. Price, 383 U.S. 787, 793, 794, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966).

10. See e. g., Watson v. City of Memphis, 373 U.S. 526, 83 S.Ct. 1314, 10 L.Ed.2d 529 (1963) (municipal recreational facili-

ties); Browder v. Gayle, 142 F.Supp. 707 (M.D.Ala.) aff'd per curiam, 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114 (1956) (municipal parks); Dawson v. Mayor and City Council of Baltimore, 220 F.2d 386 (4th Cir.), aff'd per curiam 350 U.S. 877, 76 S.Ct. 133, 100 L.Ed. 774 (1955) (municipal beaches); Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (municipal schools).

11. Defendant Chandler testified in his deposition that:
"We have tried to serve the people where they are and as they are. [N]or would we want to put a child into a program where he would be ill at ease and unaccepted."

12. The selection of the sites for the location of these branches has undoubtedly contributed to this situation.

the branch nearest the school; a student seeking YMCA membership was supposed to join the branch to which his school had been assigned. The purported reason for the plan was to assist the individual branches in co-ordinating their athletic programs with those of the city's schools. As the plan now operates, however, every predominately white school in the city is assigned to one of the three all-white branches even though the school may be closer to the Cleveland Avenue branch. Every predominately Negro school is, regardless of its location, assigned to the Cleveland Avenue branch. Furthermore, even those Negroes who attend predominately white schools are permitted to join only the Cleveland Avenue branch. The effect of this plan is, therefore, to require all black youths who wish to join the YMCA to enroll at the Cleveland Avenue branch.

Defendants' efforts to operate Camp Belser on an all-white basis have been only slightly less disingenuous. The Director of the program recruits only at predominately white schools. While the white branches post notices and send their members brochures publicizing the program, no information about the Camp is given to the Cleveland Avenue branch or sent to its members. The minutes of the Board of Directors' meetings indicate that the Board has, for the past several years, seriously considered the possibility of either procuring funds to build a Negro camp to be operated by the Cleveland Avenue branch or setting aside a week at Camp Belser each summer for the exclusive use of Cleveland Avenue's members.[13]

An examination of the manner in which defendant administers its football program further buttresses plaintiffs' allegations of purposeful racial discrimination. The YMCA, as part of its cooperative agreement with the City, operates a football program for grade school children at its South, East and Cleveland Avenue branches. This program is available to all of the city's elementary school children, that is, membership in the YMCA is not required. As has been previously noted, the predominately white elementary schools are assigned to the South and East branches while the predominately Negro schools are assigned to Cleveland Avenue. There are, as a result, only two or three Negroes participating in the leagues at the East and South branches, while there are only a handful of whites playing in Cleveland Avenue's leagues.

The football season culminates with the playing of two bowl games, both sponsored by the YMCA. One game is played at Cramton Bowl, a municipal stadium donated by the City, between the league champions of the East and South branches. All the teams in the other bowl game, which is played at the football stadium of Alabama State University, a Negro school, are from the Cleveland Avenue branch.

■■ The fact that defendants have engaged in a pattern and practice of racial discrimination does not necessarily mean, however, that they have violated plaintiffs' rights under the Equal Protection Clause, for the Fourteenth Amendment "erects no shield against merely private conduct, however discriminatory or wrongful."[14] The protections of the Equal Protection Clause are brought into play only when "state action" is involved. When the actions being attacked as unlawful are those of allegedly "private parties", the court must determine

13. In April of 1969, defendants notified the director of the Cleveland Avenue branch that the Board had decided to set aside one week during the summer for the Cleveland Avenue branch. Because notice of the Board's decision was never adequately communicated to the branch's members, however, only a few members applied and plans for the "special week" were called off.

14. Shelley v. Kraemer, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1947); see e. g., the Civil Rights Cases, 109 U.S. 3, 11, 3 S.Ct. 18, 27 L.Ed. 835 (1883).

whether there is sufficient state participation to transform the "private" conduct into state action.

■ It is not always easy to determine what is "private" action and what is "state" action. As the Supreme Court has noted:

[T]o fashion and apply a precise formula for recognition of state responsibility under the Equal Protection Clause is an "impossible task" which "This Court has never attempted." [Citation omitted.] Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance. [Burton v. Wilmington Parking Auth., 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961)]

■ The State of Alabama has involved itself in the affairs of the YMCA by providing it with financial assistance in the form of a substantial tax exemption. A state statute exempts the YMCA from having to pay all state, county and municipal taxes, licenses, fees and charges of any kind on its almost $2,000,000 of fixed property. Code of Alabama, Title 51, § 12 (1957). While this tax exemption, in itself, may not necessarily bring the YMCA within the ambit of the Fourteenth Amendment, it "attain[s] significance when viewed in combination with other attendant state involvements." [15]

A more significant state involvement is the City of Montgomery's Park and Recreation Department's cooperative agreement with the YMCA. In 1958, the Mayor of Montgomery and the President of the Montgomery YMCA decided to create a "Montgomery Park and Recrea-

tion Department—YMCA Co-ordination Committee" to advise the City and the YMCA as to how they could best co-ordinate their facilities and programs. This committee is comprised of three members of the Recreation Department Board and three members of the YMCA Board, with the Mayor, Recreation Superintendent and YMCA General Secretary serving as ex officio members.

The recommendations of this committee have had a substantial impact on the number and types of programs offered by the YMCA. The YMCA does not offer a program if it will either duplicate or conflict with one given by the Recreation Department. The YMCA, for example, conducts football, basketball and track programs for all of the city's elementary school children but does not conduct any of these programs for the city's junior high school students. The responsibility for administering the latter programs has been delegated to the Recreation Department. This co-ordinated effort between the Recreation Department and the YMCA has, therefore, directly involved the City in the management and operation of the YMCA.[16]

Furthermore, the YMCA, as a result of this cooperative agreement, has been the recipient of numerous benefits from the City. It is given free use of the city's parks, playgrounds and lighting equipment for its various athletic programs. The city water works furnishes the YMCA with free water for its swimming pools. The YMCA is permitted to recruit for its Camp Belser program and for other activities in the city's public schools. The furnishing of these and other amenities [17] has further "insinuated [the City of Montgomery] into a posi-

---

15. Eaton v. Grubbs, 329 F.2d 710, 713 (4th Cir. 1964); see Evans v. Newton, 382 U.S. 296, 301, 86 S.Ct. 486, 15 L.Ed. 2d 373 (1966). The YMCA also receives substantial financial assistance from the United Appeal, which provides the YMCA with approximately 20% of its annual operating revenue.

16. Cf. Evans v. Newton, *supra* at 298, 86 S.Ct. 486; Pennsylvania v. Board of Directors, 353 U.S. 230, 231, 77 S.Ct. 806, 1 L.Ed.2d 792 (1957).

17. The City also has, for example, paved at least one of the YMCA's parking lots at no cost to the Association.

tion of interdependence"[18] with the YMCA.[19]

Furthermore, the YMCA, as a result of its cooperative agreement with the City, has been performing a statutorily declared "public function". The record shows that the Montgomery Park and Recreation Board is, by statute, given responsibility "for the direction, supervision and promotion of such recreational programs as will contribute to the general welfare of the residents" of Montgomery.[20] By co-ordinating its programs with and delegating the operation of others to the YMCA, the Board has, in effect, transferred some of its statutory authority and responsibility to the YMCA, thereby investing it with a municipal character.[21] The YMCA has, therefore, been serving as a municipal, rather than a private, agency in assisting the Board in providing recreational programs for the City of Montgomery.[22]

The desire of the City to have the YMCA assist it in providing mass recreation to the residents of Montgomery has manifested itself in other ways. In 1961, the City Board of Commissioners passed an ordinance which authorized the City to deed the Perry Street Recreation Park to the YMCA for the sum of $18,000. The City reserved the right, however, to repurchase the land for the original sale price, if after three years time the YMCA failed to construct upon the land at a cost of not less than $100,000, a facility to be used for "athletic, health,

recreational and religious" purposes. Since the YMCA's Central branch was built on this site within the three-year period, the option to repurchase was never exercised.

This is not a case where a city has, in selling municipal property, divested itself of all rights in the property.[23] Here the City retained for itself a substantial interest in the property by reserving an option to repurchase the property at the original sale price if the property was used for any other purpose than providing recreational facilities for the city's youth. Since the property had to be used for the same purpose after the sale as before, the YMCA merely exchanged places with the City as provider of recreation for the neighborhood.

Such a conclusion is required by a Fifth Circuit case, Hampton v. City of Jacksonville,[24] in which the purchaser of a municipal golf course attempted to operate the course on a segregated basis. The deed contained a reversionary clause which provided that if the property were ever used for any purpose other than as a golf course, it would immediately revert to the city. The Court admonished that:

[W]here the City of Jacksonville, which has long been in the business of operating golf courses for its residents, elects to sell the golf courses, but only on condition that they continue to be used in such manner that the public will still enjoy their benefits

18. Burton v. Wilmington Parking Auth., *supra*, 365 U.S. at 725, 81 S.Ct. at 862.

19. See Evans v. Newton, *supra*, 382 U.S. at 301, 86 S.Ct. 486; Hadnott v. City of Prattville, 309 F.Supp. 967 (M.D.Ala. 1970); Statom v. Board of Commissioners, 233 Md. 57, 195 A.2d 41, 46–47 (1963).

20. Ala.Code, Appx., Pt. II, Art. 35A § 1317 (51) (1969).

21. The preamble to the "Recreation Department—YMCA Co-ordination Committee" agreement provides that the purpose and objective of the agreement is to "provide the maximum recreation pro-

gram to the people of Montgomery * * * and to supplement the work of each other."

22. See Statom v. Board of Commissioners, *supra* at 43. Cf. Evans v. Newton, *supra*, 365 U.S. at 302, 86 S.Ct. 486.

23. Cf. Derrington v. Plummer, 240 F.2d 922, 925 (5th Cir. 1956), cert. denied 353 U.S. 924, 77 S.Ct. 680, 1 L.Ed.2d 719 (1957); Tonkins v. City of Greensboro, 276 F.2d 890, 892 (4th Cir. 1960).

24. 304 F.2d 320 (5th Cir.), cert. denied, Ghioto v. Hampton, 371 U.S. 911, 83 S.Ct. 256, 9 L.Ed.2d 170 (1962).

in the same capacity, the city is permitting the private individual to perform this part of the City's function.[25]

■ One final factor this Court has considered in making its finding and conclusion that defendants' discriminatory conduct has "became so entwined with governmental policies [and] so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action"[26] is that the YMCA has prospered substantially from its cooperative effort with the City of Montgomery. In 1957, the YMCA operated one small branch in downtown Montgomery which had less than 1,000 members. By 1960, two years after the "Co-ordination Committee" had been created, it operated five branches with five swimming pools. Today the YMCA operates six branches with eight swimming pools and has approximately 18,000 members. The rights of a property owner over his property are not absolute[27] and "[t]he more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it."[28]

■ This Court concludes, therefore, that defendants' discriminatory conduct denied plaintiffs their Fourteenth Amendment right to Equal Protection of the Law. While the concepts of "state action" and "under color of law" are not necessarily synonymous,[29] this Court further concludes that under the facts of this case, plaintiffs' showing of "state action" satisfies the requirement under § 1983 that defendants' conduct be "under color of law."

In reaching this conclusion, the Court has carefully considered the purpose and effect of the City's and the YMCA's co-ordinated effort.[30] An analysis of the historical context which prompted the establishment of the cooperative agreement makes it unmistakably clear that its purpose was to circumvent the Supreme Court's and this Court's desegregation rulings in the area of public recreation.[31]

On June 4, 1957, the City of Montgomery passed an ordinance requiring segregation in all public recreational facilities.[32] On December 22, 1958, eight Ne-

25. 304 F.2d at 323. Cf. Wimbish v. Pinellas County, 342 F.2d 804 (5th Cir. 1964).

26. Evans v. Newton, *supra*, 365 U.S. at 299, 86 S.Ct. at 488.

27. Cf. Village of Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); Walls v. Midland Carbon Co., 254 U.S. 300, 41 S.Ct. 118, 65 L.Ed. 276 (1920).

28. Marsh v. Alabama, 326 U.S. 501, 506, 66 S.Ct. 276, 278, 90 L.Ed. 265 (1946). Cf. Amalgamated Food Employees Union Local 590 v. Logan Valley, 391 U.S. 308, 316, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968).

29. See Adickes v. S. H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (U.S. June 1, 1970) (Brennan, J., concurring).

30. Cf. Grosjean v. American Press Co., 297 U.S. 233, 250, 56 S.Ct. 444, 80 L.Ed. 660 (1936); Poindexter v. Louisiana Financial Assistance Comm'n, 275 F.Supp. 833, 837–838 (E.D.La.1967), aff'd 389

U.S. 571, 88 S.Ct. 693, 19 L.Ed.2d 780 (1968).

31. The following cases poignantly describe the problems the City of Montgomery has had in adapting to the mandates of *Brown* and its progeny: Browder v. Gayle, 142 F.Supp. 707 (M.D.Ala.) aff'd per curiam, Gayle v. Browder, 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114 (1956); United States v. U. S. Klans, Knights of Ku Klux Klan, Inc., 194 F.Supp. 897 (M.D.Ala.1961); Lewis v. Greyhound Corp., 199 F.Supp. 210 (M.D.Ala.1961); United States v. City of Montgomery, 201 F.Supp. 590 (M.D. Ala.1962); Cobb v. Montgomery Library Bd., 207 F.Supp. 880 (M.D.Ala. 1962); Carr v. Montgomery County Bd. of Educ., 289 F.Supp. 647 (M.D.Ala. 1968), aff'd. 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969).

32. Montgomery Ordinance No. 21–57 (1957) provides in pertinent part:
Section I. It shall be unlawful for white and colored persons to enter up-

gro plaintiffs filed a class action with this Court asking that the ordinance and the City's policy and practice of operating segregated recreational parks be declared unconstitutional. Prior to filing suit, plaintiffs had asked the City Board of Commissioners to repeal the ordinance and to permit them the use of any and all of the City's parks. This request was denied by the City Commissioners on September 17, 1958, the Commissioners then stating, "The Commission will not operate integrated parks."

Immediately after suit was filed, the Board of Commissioners passed a resolution closing the parks to all persons, such resolution taking effect on January 1, 1959.[33] On September 9, 1959, this Court entered judgment in Gilmore v. City of Montgomery,[34] holding the ordinance and the policy and practice of the City in operating segregated parks to be unconstitutional and enjoining defendant Board of Commissioners and defendant Park and Recreation Board from enforcing the ordinance and from operating the municipal parks, when and if they were reopened, on a segregated basis.

It was during this period that the City and the YMCA first decided to co-ordinate their efforts. A special committee composed of Board and key staff members of the YMCA and the Park and Recreation Department was established to make a study of the different recreational services offered by each organization.

The President of the YMCA, in a letter to the Mayor, suggested "that we do not include the Negro staff members or Board members." As a result, the only branch not represented on the committee was Cleveland Avenue.

The effect of this agreement has been the perpetuation of segregated recreational facilities and programs in the City of Montgomery. This Court finds, based on the purpose and the effect of the agreement, that the City's primary purpose in co-ordinating its efforts with those of the YMCA was to encourage and assist the YMCA in accomplishing what the Park and Recreation Board is constitutionally forbidden to accomplish.[35]

IV

In Count Two of their complaint, plaintiffs allege that defendants, in denying them equal membership rights in the Montgomery YMCA organization, have violated their rights under 42 U.S. C. § 1981. This section provides that:

[A]ll persons in the United States shall have the same right * * * to make and enforce contracts * * * as is enjoyed by white citizens.

Since the defendants' discriminatory actions have already been found to constitute "state action" and to be "under color of law," this Court does not feel it necessary or appropriate to determine whether, under the facts presented in this case, § 1981 prohibits discrimination by private parties.[36] Since the YMCA,

---

on, visit, use or in any way occupy public parks or other public houses or public places, swimming pools, wadding [sic] pools, beaches, lakes or ponds except those assigned to their respective races.

33. The Board of Commissioners expressly states in the resolution that its decision to close the parks was prompted by the plaintiffs' attempt "to compel the integration of Oak Park and other public parks in the City of Montgomery."

34. 176 F.Supp. 776 (M.D.Ala.1959), modified 277 F.2d 364 (5th Cir. 1960).

35. See Lee v. Macon County Board of Education, 267 F.Supp. 458, 475–476

(M.D.Ala.), aff'd Wallace v. United States, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967) and cases cited therein.

36. It should be noted, however, that the Supreme Court's recent holding in Jones v. Alfred Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), is to the effect that 42 U.S.C. § 1982 prohibits all discrimination—public or private—against Negroes in the sale or rental of property. It may logically follow that, since §§ 1981 and 1982 were both originally a part of § 1 of the Civil Rights Act of 1866, under the rationale of Jones v. Alfred Mayer Co., supra, § 1981 also prohibits private as well as public discrimination against Negroes.

in discriminating against the plaintiffs, has acted as a public agency and "under color of law," there is no question but that its refusal as a public agency to extend the same contractual opportunities and rights to Negroes as it does to whites clearly violates § 1981.

## V

Count Three of plaintiffs' complaint is bottomed on Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a et seq. This section prohibits discrimination or segregation on the ground of race, color, religion or national origin in places of public accommodation.

 The YMCA contends that it is exempt from coverage under the Act by virtue of § 2000a(e) which provides that "[t]he provisions of this subchapter shall not apply to a private club or other establishment not in fact open to the public." The burden of proving private club status rests upon the YMCA.[37] The record shows that the Montgomery YMCA does possess certain superficial characteristics normally associated with a private club. It offers eight different types of membership, ranging in cost from $15 to $125. There are certain prerequisites for membership, such as the filing of an application form and the payment of annual dues.[38] Furthermore, membership cards are allegedly required for admittance to all athletic facilities.

 A closer examination of the record, however, renders defendants' claim to private club status nugatory. The application form asks only for the name, home address and phone number, sex,

and business address and phone number of the applicant; no other pertinent information such as personal references or credit references is requested on the form. Application is available to "any person of good moral character who accepts the purposes, aims and objectives of the organization." Applicants are rarely interviewed, and defendants have admitted that usually no investigation is made upon the receipt of an application form.

Neither the constitution nor the by-laws of the Association limits the number of members. Almost all persons who apply are accepted for membership. The Montgomery YMCA had almost 18,000 members in 1969. "The YMCA, with no limits in its membership and with no standards for admissibility, is simply too obviously unselective in its membership policies to be adjudicated a private club."[39]

In addition, there are no rules or regulations governing or defining the rights and responsibilities of the members vis-a-vis the organization. For example, there are no provisions in the bylaws authorizing the Association to discipline or expel its members. Members own no shares and have no property interest in the corporation; title to all the facilities is in the name of the YMCA. The general membership never meets together as an official group and does not vote on any of the organization's policy decisions. The YMCA does not, therefore, have any "of the attributes of self-government and member-ownership traditionally associated with private clubs."[40]

See Scott v. Young, 421 F.2d 143 (4th Cir.), cert. denied, 398 U.S. 929, 90 S.Ct. 1820, 26 L.Ed.2d 91 (1970).

37. See Nesmith v. Y. M. C. A. of Raleigh, 397 F.2d 96, 101 (4th Cir. 1968).

38. The annual dues are waived for those children unable to pay. Defendant Chandler testified, for example, that no child is ever denied membership because he can't pay the annual fee. The YMCA has approximately 1,000 of these "deserving" members; the 500 who are white all belong to the Central branch;

the 500 who are black belong to Cleveland Avenue.

39. Nesmith v. YMCA of Raleigh, *supra* at 102; see United States by Katzenbach v. Clarksdale King & Anderson Co., 288 F.Supp. 792, 795 (N.D.Miss.1965).

40. Daniel v. Paul, 395 U.S. 298, 301, 89 S.Ct. 1697, 1699, 23 L.Ed.2d 318 (1969); see Nesmith v. YMCA of Raleigh, *supra*, 397 F.2d at 102; Bell v. Kenwood Golf and Country Club, Inc., 312 F.Supp. 753 (D.Md. May 13, 1970).

Finally, the Court again notes the public nature and character of the Association. Private clubs do not derive 20 percent of their annual revenue from public agencies as does the Montgomery YMCA, nor do they provide recreational programs for the general public.[41] The YMCA is unquestionably a public organization and is not, therefore, entitled to a § 2000a(e) private club exemption.

The next question to be answered is whether the Montgomery YMCA is "a place of public accommodation" as defined by § 2000a(b) of the Act and, if so, whether its operations "affect commerce" within the meaning of § 2000a(c) or whether its discriminatory conduct is supported by "state action" as defined by § 2000a(d) of the Act.

Section 2000a(b) defines four categories of establishments as covered public accommodations. Only one of these categories is relevant here:

Each of the following establishments which serves the public is a place of public accommodation within the meaning of this subchapter if its operations affect commerce, or if discrimination or segregation by it is supported by State action:

\* \* \* \* \* \*

(3) Any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment \* \* \*.

Section 2000a(c), entitled Operations Affecting Commerce; Criteria; Commerce defined, provides in pertinent part:

The operations of an establishment affect commerce within the meaning of this subchapter if \* \* \* (3) in the case of an establishment described in paragraph (3) of subsection (b) of this section, it customarily presents films, performances, athletic teams, exhibitions, or other sources of entertainment which move in commerce. \* \* \*

Section 2000a(d) provides that:

Discrimination or segregation by an establishment is supported by State action within the meaning of this subchapter if such discrimination or segregation (1) is carried on under color of any law, statute, ordinance, or regulation; or (2) is carried on under color of any *custom or usage required or enforced by officials of the State or political subdivision thereof*; or (3) is required by action of the State or political subdivision thereof.

The term "other place of \* \* \* entertainment" in § 2000a(b) (3) has recently been interpreted by the Supreme Court, in Daniel v. Paul,[42] to include a public establishment where entertainment takes the form of direct participation in some sport or activity as well as to an establishment where patrons are entertained as spectators or listeners. In *Daniel* the Supreme Court cited with approval the *en banc* decision of the Fifth Circuit Court of Appeals in Miller v. Amusement Enterprises [43] in which the majority held that the phrase " 'place of entertainment' \* \* \* includes both establishments which present shows, performances and exhibitions to a passive audience and those establishments which provide recreational or other activities for the amusement or enjoyment of its patrons." [44] In *Daniel*, the "place of entertainment" was a recreation area with swimming, boating, dancing facilities and miniature golf, while in *Miller*, the covered establishment under § 2000a (b) (3) was an amusement park with a skating rink and eleven mechanical rides.

This Court can find little to distinguish between the recreational activities provided by the Montgomery YMCA and those provided by the recreation area in-

41. See Nesmith v. YMCA of Raleigh, *supra*, 397 F.2d at 102; Wesley v. City of Savannah, 294 F.Supp. 698 (S.D.Ga. 1969); Williams v. Rescue Fire Co., 254 F.Supp. 556 (D.Md. 1966).

42. 395 U.S. 298, 89 S.Ct. 1697, 23 L.Ed. 2d 318 (1969).

43. 394 F.2d 342 (5th Cir. 1968).

44. 394 F.2d at 350.

volved in *Daniel* and the amusement park involved in *Miller*. The record shows that each of the YMCA branches [excluding the Camp branch] offers numerous recreational activities, such as swimming, scuba diving, table tennis, basketball and tennis. The Camp branch offers such activities as swimming, boating, waterskiing, archery, and arts and crafts. Furthermore, the Association's recreational facilities include five gymnasiums, a health club and eight swimming pools.

 Nor is there any significance in the fact that the YMCA is an eleemosynary association, while the amusement park—*Miller*—and the recreation area—*Daniel*—were operated for profit. "The courts will not enjoin discrimination motivated by profit and then allow discrimination 'for charity'." [45] Applying the reasoning of the *Daniel* and *Miller* decisions to the facts of this case, this Court concludes that the Montgomery YMCA is a "place of entertainment" within the meaning of § 2000a(b) (3).[46]

This Court further concludes that the defendants' discriminatory conduct constitutes "state action" as defined in § 2000a(d) [47] and, in the alternative, that the YMCA presents "sources of entertainment which move in commerce" within the meaning of § 2000a(c) (3),[48] thereby bringing the YMCA within the purview of the Public Accommodations chapter of the Civil Rights Act of 1964. Upon the payment of a small fee, out-of-state guests are given "guest of member" passes which entitle them to use the YMCA facilities. Much of the recreational equipment used by the YMCA is manufactured outside the State of Alabama.

In summary, this Court finds that the YMCA has engaged in and continues to engage in a pattern and practice of racial discrimination by operating segregated branches and by excluding Negroes from certain activities and holds that such conduct has violated the Constitutional rights of the plaintiffs under the Equal Protection Clause of the Fourteenth Amendment and the statutory rights of the plaintiffs under the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the Civil Rights Act of 1964, 42 U.S.C. § 2000a et seq.

An appropriate order will be entered accordingly.

## ORDER

Pursuant to the findings of fact and conclusions of law entered in the opinion of this Court this date, it is the order, judgment and decree of this Court that defendants be and they are hereby enjoined from:

1. Denying Negro applicants membership in any YMCA branch or excluding Negroes from any YMCA program or activity if such denial or exclusion is based upon race.

2. Constructing any new branches or extensions where the site selected may tend to perpetuate the past policies and practices of racial segregation.

3. Recruiting for its branches, programs or activities at predominately white schools unless recruiting of the same type and extent is conducted at predominately black schools.

4. Excluding Negroes from the city-wide Board of Directors and from any other governing bodies of the YMCA solely on the basis of race.

It is further ordered that defendants notify by letter, within 30 days from this date, each and every member that each YMCA branch and every YMCA program and activity is open to members of all races.

It is further ordered that defendants include in every advertisement, and in

---

45. Williams v. Rescue Fire Co., *supra*, 254 F.Supp. at 563.

46. See Scott v. Young, *supra*; Evans v. Laurel Links, Inc., 261 F.Supp. 474, 477 (E.D.Va.1966).

47. Cf. Williams v. Rescue Fire Co., *supra*.

48. See Daniel v. Paul, *supra* 395 U.S. at 308, 89 S.Ct. 1697; Scott v. Young, *supra*; Miller v. Amusement Enterprises, Inc., *supra*.

every brochure, pamphlet or poster, publicizing the Montgomery YMCA or any of its activities a statement that such programs and activities are open to members of all races.

It is further ordered that defendants submit to this Court, within 30 days from the date of this order, a plan detailing how the YMCA proposes to eliminate its segregated memberships and activities. Such plan will include, but need not be limited to, the following:

(1) The reassignment of the various schools in the City of Montgomery to eliminate racially segregated branches. Such factors as the geographical location, the membership capacity, and the facilities of each branch should be considered.

(2) The reassignment of the approximately 1,000 "deserving" members without regard to race.

(3) A proposal designed to insure representation of Negroes on the city-wide board of directors and other governing bodies of the YMCA.

This Court specifically retains jurisdiction in this case.