Mickey McGUIRE

v.

M. C. ROEBUCK et al.

Civ. A. No. 5189.

United States District Court,
E. D. Texas,
Tyler Division.

Aug. 11, 1972.

Larry Watts, Houston, Tex., for plaintiff.

S. M. Adams, Jr., Nacogdoches, Tex., Charles F. Potter, Tyler, Tex., for defendants.

## MEMORANDUM OPINION AND ORDER

JUSTICE, District Judge.

This civil action is the outgrowth of the dispersal by the police and other law enforcement officers of a street demonstration urging support of civil rights for black citizens of Nacogdoches, Texas, on the night of May 13, 1970. The plaintiff, Mickey Washington McGuire, a 33 year old black citizen, filed suit under the provisions of 28 U.S.C. §

1343(3) [1] and 42 U.S.C. § 1983 [2] against the defendants, the City of Nacogdoches and its Chief of Police, the Honorable M. C. Roebuck, on August 3, 1970. The suit sought, *inter alia*, a declaratory judgment that the parade ordinance relied upon by the police as justification for their action in breaking up the band of civil rights partisans is unconstitutional, an injunction against enforcement of the ordinance by the defendants, and the maintenance of the action as a class action. On motion of McGuire's counsel, the case was continued on three separate occasions, and eventually came to trial on April 10, 1972.

In 1970 Nacogdoches was a city of about 22,500 population. The Stephen F. Austin State University (SFA), which lies within the municipal boundaries, had a student population of about 10,000. Racial bias and discriminatory practices associated with a segregated society are but slowly being eradicated in Nacogdoches. The black community in Nacogdoches, consisting of approximately 5,500 persons, is situated in a well-defined area called Orton Hill. Motion picture theaters were still segregated as late as 1969. The dual school system was not dismantled until 1970.[3] The county jail, which is situated in Na-

1. Federal jurisdiction was based upon 28 U.S.C. § 1343(3). In relevant part, the statute states:
 "The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
 * * * * *
 '"(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for the equal rights of citizens or of all persons within the jurisdiction of the United States . . . ."

2. The civil action was authorized by 42 U.S.C. § 1983. The statute provides:
 "Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory, subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

3. The remainder of the findings of fact in this paragraph were made from uncontradicted testimony in Civil Action No. 5524, entitled Weaver v. Muckleroy, pending in the Tyler Division of the Eastern District of Texas. This court is entitled to take judicial notice of this evidence, Shuttlesworth v. City of Birmingham, 394 U.S. 147, 157, 89 S.Ct. 935, 22 L.Ed. 2d 162 (1968), since all of the present City Commissioners of Nacogdoches and the City Secretary were made parties defendant. The plaintiffs, black and white

students at SFA, brought suit, *inter alia*, for declaratory and injunctive relief, contending that the City Commissioners, in selecting a date on which to submit to the voters an amendment to the City Charter of Nacogdoches that would drastically alter the manner of electing City Commissioners, could not choose a date during the three months summer vacation with the express purpose of significantly minimizing the number of voters of a particular class, *i. e.*, students and professors at SFA, that would vote on the amendment. The evidence showed that students and blacks had almost succeeded in electing two of their number to the City Commission at the last preceding election for municipal officers on April 4, 1972. This court granted a preliminary injunction against the holding of the election, principally relying on the decision of the Supreme Court in Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). The injunction was stayed by the Court of Appeals for the Fifth Circuit, which cited Hamer v. Campbell, 358 F.2d 215 (5 Cir. 1966), cert. den. 385 U.S. 851, 87 S.Ct. 76, 17 L.Ed.2d 79, and Sargent v. Genesco, Inc., 458 F.2d 9 (5 Cir. 1972). The stay read, in part: "The City of Nacogdoches acknowledges by applying for this stay that the election may ultimately be set aside if the District Court's judgment on the merits is affirmed. * * * The plaintiffs having attacked the election in advance, the orderly way to preserve the status quo is to allow the election to proceed with all parties aware that it may turn out to be a nullity."

At the subsequent election, the amendment carried overwhelmingly. The City of Nacogdoches has filed notice of appeal from the order granting the preliminary injunction.

cogdoches, is still segregated. No black citizen has been elected in either municipal or county office in Nacogdoches County in modern times. One black unsuccessfully ran for the office of County Commissioner in 1959.[4]

McGuire, born and reared in Mobile, Alabama, was convicted of several felonies, involving burglary and larceny, when he was about 17 years of age. While incarcerated in the Alabama state prison system pursuant to his convictions, he managed to educate himself to some extent. In 1966, after having served six years' confinement, he obtained his release from prison by virtue of the writ of coram nobis, issued by an Alabama court. McGuire has no record of convictions since his release from prison.

In April 1970, although he was not a student, McGuire was an organizer for the National Black Student Association. In the course of his organizational activities in Houston, Texas, McGuire met several black students from SFA, who invited him to organize a chapter of the National Black Students Association at SFA. McGuire accepted the invitation, and met with a warm reception at SFA among certain elements of the students and faculty. He discussed the rights and problems of blacks in several classes conducted by white professors, and also spoke to a number of groups in the black community.

McGuire's arrival in Nacogdoches was duly reported to Chief Roebuck, who viewed the role of black militants and student activists in creating tumult and discord on the campuses and in the cities throughout the nation with extreme apprehension. Roebuck assigned a self-described "conservative" white SFA student named Russell Crawford (who volunteered to serve in an undercover capacity) to observe the movements and activities of McGuire.[5] Roebuck also requested information from the Federal Bureau of Investigation concerning McGuire, and was subsequently furnished by it with a copy of McGuire's "rap sheet".

On April 24, 1970, a black female student, Cubie Nell Dorsey, was arrested by city policemen on the campus of SFA and charged with the offenses of forgery and passing of a check at a Nacogdoches store.[6] Although he was not acquainted with Miss Dorsey, McGuire proceeded to intervene with the police, in an effort to see that her rights were protected. Immediately following her arrest, McGuire engaged in abrasive conversations concerning Miss Dorsey with the arresting officers on the campus at SFA, and later with Roebuck at the police station.[7] Finally, he attempted to be present, as an observer, at her initial appearance before a magistrate, where she was to be informed of her legal rights.

The hearing before the magistrate, the Honorable Carl Burrows, then Justice of the Peace, was conducted in a small courtroom in the Nacogdoches County Courthouse. McGuire and several of his followers appeared at the hall-

---

4. After he announced for office, a cross was burned in his yard.

5. McGuire wrongly suspected Crawford of being a surveillant for the Federal Bureau of Investigation. In one of his several impassioned speeches to black and white audiences in black churches in Nacogdoches, McGuire, observing the presence of Crawford, made extremely uncomplimentary and vile references to the F.B.I. When one of McGuire's speeches was reported to Roebuck by Crawford, Roebuck stated that he "could put an end to the nigger situation by putting a 30–30 bullet between [McGuire's] eyes."

6. She afterwards plead guilty to the offenses in the District Court of Nacogdoches County.

7. Upon being told by Roebuck at the police station that Miss Dorsey's arrest was "none of his business", McGuire angrily declared: "I'll burn this damn town down around your neck." Roebuck obviously regarded the threat with some seriousness, but he took no action on it. However, the threat was made the basis of a criminal complaint filed against McGuire in the County Court of Nacogdoches County on May 14, 1970.

way entrance to the courtroom, and McGuire knocked loudly on the closed courtroom door. Upon instructions from the Justice of the Peace, Roebuck directed McGuire and those who accompanied him to leave the premises. McGuire and the others, complaining loudly, reluctantly complied with the request.

The arrest of Miss Dorsey triggered the inception of about 15 demonstrations, inspired by McGuire, in the main business section of the city. Black citizens of Nacogdoches and black and white students from SFA participated in the demonstrations. The demonstrators, who appear to have ranged in number from five to twenty at a time, carried signs and placards indicating discontent with the lot of blacks in Nacogdoches.[8] All of the demonstrations were conducted on the sidewalks, in the daytime, and were entirely orderly and peaceful. The police made no effort to interfere with the picketing, aside from taking still photographs and moving pictures of the participants. When the sidewalk demonstrations began, Chief Roebuck, manifestly alarmed by them, requested the Department of Public Safety to furnish additional personnel to the Nacogdoches area for emergency use. Thirty extra patrolmen were assigned by the Department of Public Safety to Nacogdoches on April 25, 1970, and thereafter on a daily basis through May 13, 1970.

On May 4, 1970, several students were killed by National Guard troops at Kent State University in Ohio, which precipitated demonstrations by students on the campuses of colleges and universities all over the United States. A few days before May 13, 1970, in memorium to the dead students at Kent State, white and black students of SFA conducted a large so-called "candlelight march" between the campus and the main business quarter of Nacogdoches. This march was made entirely on the sidewalks bordering North-South Street (State Highway No. 59), the main-traveled street in Nacogdoches. The Kent State incident and the related demonstrations, local and nationwide, reenforced Chief Roebuck's fears of widespread revolutionary activities in the United States.

On May 11, 1970, two black SFA students planned another candlelight march for the night of May 13, 1970, to demonstrate "a spirit of brotherhood between black and white citizens of Nacogdoches." On the night of May 13, a group of black and white students met in the home of Helena Patton, a black student, in the Orton Hill area of Nacogdoches. McGuire, who had been out of the city, arrived at the Patton home immediately before the beginning of the march. The leadership of the procession intended that it should proceed from the Patton home to the Federal Building, located in the main business portion of Nacogdoches, and then return to the point of origin. The procession was planned and executed as a columnar formation, complete with parade marshals to keep the column in order. At the inception of the demonstration, the participants marched, five abreast, through the streets of the Orton Hill district.[9] As it wound its way through the Orton Hill area, numerous other blacks joined the procession until it numbered about 250.

The column of demonstrators left the Orton Hill area by way of Shawnee Street, proceeding in a northerly direction. When the column arrived at East Main Street, which leads to the main business sector of the city, it turned west. The demonstrators obeyed the traffic signals at the intersection, and no traffic was blocked. After turning west onto East Main Street, the demonstrators, still in a well-controlled column, stayed largely on the sidewalks on the north side of the street, although there was some overflow onto the part of the

8. The placards and signs read as follows: "End discrimination"; "Respect the black"; "Don't rob the poor"; "Together we stand, divided we fall"; "Blacks want equal rights"; "Let's live together"; and "Hunger is a felony".

9. Orton Hill had very few sidewalks, and the streets were largely unpaved.

street marked by painted lines for the diagonal parking of vehicles. At the time, the demonstrators were singing patriotic songs and spirituals and chanting slogans identified with the nonviolent civil rights movement in the Southern states. Their mood was described as "happy", and the demonstration was orderly.

Proceeding west along East Main Street, the procession crossed Lanana, Walker, Mound and Church Streets. East Main Street is four lanes in width as far as Mound Street, where it narrows to two lanes. There was no obstruction of traffic by the demonstrators as far as Mound Street; but by reason of the narrowing of the street at that point, the north lane of traffic was partially obstructed by the marchers, after they passed Mound Street. Nevertheless, the normal flow of traffic was not materially interfered with by the marchers.

When the column reached the main business portion of town, near the vicinity of Mound and Church Streets, vehicular traffic was light. It was approximately 9:00 o'clock p. m., and none of the business firms were open, except for a business college on the second floor of a building overlooking East Main Street. After the demonstrators passed Church Street, but before they reached the next street, Fredonia, they were turned back by members of the Nacogdoches police force and other law enforcement officers.

The demonstrators had been observed by a black member of the police force at the intersection of Shawnee and East Main Street. This policeman drove to the police station, located one block south of East Main Street on Fredonia Street, where he notified patrolman Smith Parmer of the march. Parmer communicated with Chief Roebuck by telephone; and other law enforcement personnel were immediately notified of the demonstration by police radio dispatchers. Parmer then sped in his police vehicle to the head of the procession, where McGuire was in the lead. Al-

though no violence or disruptions had attended the march up to this point, except for the noise made by the demonstrators in singing and chanting, Parmer peremptorily directed McGuire and the rest of the demonstrators to turn back. Parmer's commands were ignored, and he thereupon arrested, at gunpoint, McGuire and another black, one Willie Wade, who were immediately transported to the City Jail of Nacogdoches in a police vehicle. During the period while McGuire and Wade were being arrested, and after their departure, the marchers surged forward and partially blocked East Main Street.

Numerous law enforcement officers, including Chief Roebuck, Texas Department of Public Safety personnel, and members of the staff of the Sheriff of Nacogdoches County, had by this time arrived on the scene. In response to commands from the police and other law enforcement officers, and also in reaction to directions from their parade marshals, the demonstrators returned to the raised sidewalks on the north side of East Main Street and proceeded east. To hasten the marchers along their way to the sidewalks and to the east, a few of the police officers present resorted to the indiscriminate use of mace. Other force was used by the law enforcement officers, but there were no serious injuries inflicted on any of the demonstrators or the officers.

The dispositions of certain of the marchers apparently turned ugly as they proceeded toward Shawnee Street, and two trash cans were overturned. When they reached the intersection of East Main Street and Shawnee Street, the demonstrators congregated on a vacant lot, and a number cursed and threw rocks and bottles at the peace officers confronting them. The plate glass windows of two business establishments were broken, as well as several automobile windshields, and a wooden boat next to a store was set on fire; but the identity of the demonstrators involved in the various acts of vandalism was not established.

The demonstrators were then driven back onto Shawnee Street and into the Orton Hill vicinity by peace officers, where they reassembled at the home of Helena Patton, the point from which the march had originated. A new leader, Rufus Woodrow, a black athlete at SFA, rallied the dispirited demonstrators, and they again attempted to march from the Orton Hill area into the white part of the city. A phalanx of heavily armed peace officers blocked their departure, however, at each of the several exits from the Orton Hill community. On one of these occasions, another rock throwing incident occurred. However, Woodrow managed to stop the activities of the overwrought rock throwers, and no other acts of violence accompanied the marches. Eventually, the peace officers permitted the demonstrators to disperse and return to their homes without further embroilment.

McGuire remained at the City Jail for about one hour. He was then taken to the County Jail at Nacogdoches County, two blocks away, accompanied by a large contingent of armed law enforcement officers and approximately five police vehicles. McGuire remained, incommunicado, in the County Jail until May 15, 1970, at about 8:00 a. m., when he was taken before Carl Burrows, the Justice of the Peace. Burrows set bail on five misdemeanor charges, which had been filed against McGuire in the County Court of Nacogdoches County on May 14, 1970, in the total sum of $105,000.[10] He had never before set bail as high as this in any misdemeanor cases.

The judge of the Corporation Court, the Honorable H. W. Whitten, was also present on this occasion. Judge Whitten informed McGuire that he was charged with the violation of two ordinances of the City of Nacogdoches, and bail was set at $1,000.00 for each offense. One of the complaints in the Corporation Court charged McGuire with a violation of Section 21–37 of the Code of Ordinances of the City of Nacogdoches. The ordinance in question, which was adopted on August 9, 1965, is set out in the margin.[11] After the hearings before the

10. The charges against McGuire were: (1) knowingly and wilfully committing an act, that is, "leading and urging on a mob by gestures and loud shouting, which under the circumstances was reasonably calculated to and did produce a clear and present and immediate threat to the property of another"; (2) "disorderly conduct, to-wit, by engaging in behavior of a boisterous and tumultuous character, to-wit, by shouting, screaming and yelling in a public place . . . in such a manner as to create a clear and present danger of alarming persons where no legitimate reason for alarm exists"; (3) "by threatening words, to-wit: 'I'll burn this damn town down around your neck', [McGuire] attempted to prevent M. C. Roebuck, Chief of Police of the City of Nacogdoches, Texas, from performing the duties of his lawful employment as Chief of Police . . ."; (4) "disorderly conduct, to-wit, by engaging in behavior near and in the Nacogdoches County Courthouse wherein judicial proceedings were being had, to-wit, the felony arraignment of the subject Cubie Nell Dorsey, which behavior was designed and had the effect of interfering with the administration of justice, and which behavior consisted of the agitation of a group of persons by shouting loudly and threatening to free the said Cubie Nell Dorsey, which behavior had the effect of disrupting the Justice Court of Precinct No. 1, Nacogdoches County, Texas"; and (5) "disorderly conduct, to-wit, by then and there engaging in violent and forceful behavior, to-wit, by shouting, screaming and gesturing, in a public place, to-wit, in the right-of-way of East Main Street in the City of Nacogdoches, Texas, there being a clear and present danger therefrom that free movement of other persons, to-wit, members of the public, would be arrested or restrained in the lawful exercise of business and amusement by the blockage of said East Main Street consequent to said behavior." All of the complaints except (3) were signed by Smith Parmer and related to the events of May 13, 1970, other than (4) which made reference to April 24, 1970. The complaint in (3) was signed by Roebuck and referred to the date of April 24, 1970.

11. "No procession, excepting the forces of the United States Army or Navy, the military forces of this State, and the forces of the Police and Fire Department, shall occupy, march or proceed along any street

Justice of the Peace and the City Judge, McGuire was returned to the Nacogdoches County Jail, where he remained for about one week. The Honorable George Middlebrook, at that time the County Judge of Nacogdoches County, then revoked the orders of the Justice of the Peace setting bail for McGuire, and lowered the bail to a total of $7,500. McGuire subsequently made bail for both the state and city offenses charged against him.

McGuire left the City of Nacogdoches some months after his arrest. He had not been brought to trial for any of the offenses charged against him in either the County Court of Nacogdoches County or the Municipal Court of the City of Nacogdoches at the time of the trial of the instant case. A few sidewalk demonstrations by blacks occurred in Nacogdoches in the days following the arrest of McGuire on May 13, 1970; but no street processions or sidewalk demonstrations of any type have taken place since that time.

■ Since McGuire is seeking a declaratory judgment that the procession ordinance which he is charged with violating in the Corporation Court of the City of Nacogdoches is unconstitutional, the Court is confronted with the decision of the Supreme Court in Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971). It was there held that where a state prosecution is pending, "the same equitable principles relevant to the propriety of an injunction must be taken into consideration by federal district courts in determining whether to issue a declaratory judgment." Thus, if an injunction would be impermissible under the circumstances, "declaratory relief should ordinarily be denied as well." Id., at 73, 91 S.Ct. at 768.

Until the Supreme Court decided Mitchum v. Foster, 1972, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705, one posited

obstacle to injunctive relief in suits brought under the Civil Rights Act of 1871, 42 U.S.C. § 1983, was the federal anti-injunction act, 28 U.S.C. § 2283, which provides that a federal court may not enjoin state court proceedings "except as authorized by Act of Congress." In Mitchum, it was decided that § 1983 is within that exception; but the court was at pains to emphasize that it did not ". . . question or qualify in any way the principles of equity, comity, and federalism that must restrain a federal court when asked to enjoin a state court proceeding." Id. at 243, 92 S.Ct. at 2163.

These principles were dealt with at length in Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669, and its companion cases, insofar as they dealt with pending state prosecutions.

"In Younger, [the Supreme Court] emphatically reaffirmed 'the fundamental policy against federal interference with state criminal prosecutions.' 401 U.S., at 46, 91 S.Ct. [746.] at 751. It made clear that even 'the possible unconstitutionality of a statute "on its face" does not in itself justify an injunction against good faith attempts to enforce it.' 401 U.S., at 54, 91 S.Ct. [746] at 755. At the same time, however, the Court clearly left room for federal injunctive intervention in a pending state court prosecution in certain exceptional circumstances— where irreparable injury is both 'great and immediate,' 401 U.S., at 46, 91 S.Ct. [746,] at 751, where the state law is 'flagrantly and patently violative of express constitutional prohibitions,' 401 U.S., at 53, 91 S.Ct. [746,] at 755, or where there is a showing of 'bad faith, harassment, or . . . other unusual circumstances that would call for equitable relief.' 401 U.S., at 54, 91 S.Ct. [746] at 755," Mitchum v. Foster, supra, 407 U.S., at 230, 92 S.Ct., at 2156.

---

except in accordance with a permit issued by the City Manager. The City Manager shall have reasonable notice of application for such permit so as to arrange

necessary safety precautions for such. The above does not apply to funeral processions."

The defendants rely upon the ordinance adopted on August 9, 1965 (relating to processions upon the streets of Nacogdoches), as a justification for the actions of the police in forcibly disbanding the demonstrators. It is undisputed that the demonstrators did not apply for a permit to conduct a procession, as required by the ordinance. The first question, then, is whether it is "flagrantly and patently violative of express constitutional prohibitions."

"The right to use a public place for expressive activity may be restricted only for weighty reasons," Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972), and any system of prior restraints of expression comes to a federal court "bearing a heavy presumption against its constitutional validity." Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584. In particular, expressive activity relating to the use of the streets of a municipality is entitled to First Amendment protection, for

"[w]herever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for the purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens." Hague v. C. I. O., 307 U.S. 496, 515–516, 59 S.Ct. 954, 964, 83 L.Ed. 1423.

The City obviously failed to overcome the presumption against the constitutionality of the ordinance of August 9, 1965. The ordinance conferred upon the City Manager exclusive and unrestrained authority to grant or deny permits to conduct parades and processions on the streets of Nacogdoches and did not, even colorably, purport to impose any standards to guide the City Manager in his decision-making process. Numerous decisions of the Supreme Court and lower courts have invalidated ordinances which give authority to a public official to sanction or prohibit, at will, the exercise of expressive activity. Thus, in Shuttlesworth v. Birmingham, 394 U.S. 147, 150–151, 89 S.Ct. 935, 939, 22 L.Ed.2d 162 (1969), it was held:

"[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional. 'It is settled . . . that an ordinance which, like this one, makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms.' Staub v. Baxley, 355 U.S. 313, 322, 78 S.Ct. 277, 282, 2 L.Ed.2d 302." [12]

Defendants point to the fact that the City Manager had granted 65 permits and had never refused to issue a permit for a procession, up to and including May 13, 1970. The defendants contend that "[t]he only requirement was that the paraders (demonstrators) should check with the police department to arrange the route and for police supervision in order to insure the proper flow of traffic and proper observation of the law." They apparently suggest, therefore, that a construction was placed on the ordinance by the City which is binding upon this court. This contention ignores the holdings of the Fifth Circuit in Anderson v. Nosser, 438 F.2d 183, 194 (5 Cir. 1971), Strother v. Thompson, 372 F.2d 654 (5 Cir. 1967), and Guyot v. Pierce, 372 F.2d 658 (5 Cir. 1967). Cf.

---

12. Several of the decisions relating to ordinances requiring permits are collated in

Staub v. Baxley, supra, 355 U.S., at 323–325, 78 S.Ct. 277, 2 L.Ed.2d 302.

**1120**

Cox v. Louisiana, 379 U.S. 536, 556–558, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965).

In *Guyot, supra,* 372 F.2d, at 662, the court stated:

"The undisputed proof in the record from a responsible police official is:

"'That the City Council in arriving at its decision [as to granting permits] considered the following problems: Traffic control along the proposed parade or march route; the size and number, length, number of vehicles, etc. that would be in the parade; the number of police and police vehicles that would be needed or required to handle the proposed parade; the time element in connection with any such proposed parade in order that such parade would not interfere with the normal flow of traffic.'

"This witness testified that the only reason for requiring a permit was in order that traffic could be controlled and law and order maintained during the parade.

"These are, of course, objects of legitimate municipal concern, which, as already pointed out, the City clearly has the authority to handle in a constitutional manner.

"The difficulty is that these standards and considerations do not appear in the face of the Ordinance."

Furthermore, *id.,* at 660, the court pointed out that:

"[D]uring the three year period immediately preceding this attempted parade without a permit there had been 13 parade permit applications filed in the City of Jackson and none had been denied. Almost half of those granted were for Negroes and/or civil rights demonstrations."

In Strother v. Thompson, supra, 372 F.2d, at 657, the court held:

"We can find nothing in the ordinance which requires the Council to issue a license. The ordinance carries no command to grant an application, neither does it prescribe the criteria or standards upon which an application is

to be denied. * * * [W]hen the ordinance is altogether silent as to when and under what circumstances the permit shall or shall not be granted, then there is no way to find out what would constitute legal discretion. Only unfettered power remains.

"We are, therefore, of the opinion that this ordinance is indeed unconstitutional on its face and cannot be squared with constitutional guarantees."

■ This court has not been directed to any decision by the state courts which has construed the ordinance and "defined the limitations of the authority conferred for the granting of licenses for parade and processions", as was the case in Cox v. New Hampshire, 312 U.S. 569, 575, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). It is not within the power of this court to thus narrow the ordinance. United States v. 37 Photographs, 402 U.S. 363, 369, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971). Hence, because of its failure to set any standards whatsoever to guide the licensing authority, the ordinance is patently and flagrantly unconstitutional on its face.

■ The defendants maintain that since the plaintiffs made no effort to comply with the provisions of the ordinance which required a permit for a procession, they are not entitled to complain of its unconstitutionality. But this contention had been foreclosed by Shuttlesworth v. Birmingham, supra, 394 U.S., at 151, 89 S.Ct., at 939, and the cases cited there, where it was declared that:

"[O]ur decisions have made clear that a person faced with such an unconstitutional licensing law may ignore it and engage with impunity in the exercise of the right of free expression for which the law purports to require a license."

Considering the invalidity of the ordinance of August 9, 1965, it is thus clear that McGuire and other black and white dissidents in Nacogdoches were entitled to the free expression of their ideas on

the streets of Nacogdoches, even though their views were regarded with hostility and apprehension by the Chief of Police and other officials. As said in Robinson v. Coopwood, 292 F.Supp. 926, 934 (N. D.Miss.1968), aff'd 415 F.2d 1377 (5 Cir. 1969):

> "The exercise of the rights of free speech and free assembly cannot be made a crime, nor may those who seek to freely exercise those rights be criminally punished for failure to previously register their intentions with law enforcement officers, in absence of a situation involving clear and present violence, or threat thereof."

The record in this case abundantly demonstrates that, until it was broken up by law officers, no such clear and present danger of violence or disruption existed in connection with the march in issue. It was conducted at a time when automotive traffic was light in the main business section of town, and the marchers were orderly and well behaved until routed by law officers. Certainly the minor inconvenience to traffic occasioned by the march could not validly be equated with a "serious substantive evil." Terminiello v. Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131. The extensive picketing activities in the business area of Nacogdoches had failed to produce any disturbances which would qualify as threats to the public order or safety; and the first candlelight march likewise did not result in rioting or other unlawful activities by the participants. In view of these circumstances, the police and other officers of the law were not legally warranted in preventing the march on the basis of threatened public disorders, for "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." Tinker v. Des Moines Independent Community School District, 393 U.S. 503, at 508, 89 S.Ct. 733, at 737, 21 L.Ed.2d 731 (1969).

An arguable case may be made that the original ordinance of August 9, 1965, is invalid, also, because of its discriminatory enforcement by the police, i. e., demonstrations by college students in celebration of victories by the SFA basketball team were not disturbed by the police, even though no demonstration permits were applied for or granted. Cox v. Louisiana, *supra,* 379 U.S., at 557, 85 S.Ct. 453. But see Robinson v. Coopwood, *supra,* 292 F.Supp., at 934. It may also be contended that both the original ordinance and the amended ordinance, hereafter referred to, are unconstitutional, because they make distinctions between peaceful funeral processions and military marches, on the one hand, and other peaceful demonstrations, on the other hand. Police Department of the City of Chicago v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); Grayned v. City of Rockford, *supra.* However, a decision on these postulated grounds for invalidity of the ordinances is not necessary, and they will not be considered further.

There remains for consideration whether the existing prosecution of McGuire for a violation of the original procession ordinance is in bad faith and without hope of obtaining a valid conviction. Perez v. Ledesma, 401 U.S. 82, 85, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971). The attorneys for defendants, demonstrating a remarkable lack of candor with the court, have refused to acknowledge the unconstitutionality of the challenged ordinance; but the members of the City Commission have tacitly done so, i. e., by making reference to the "possibility of the unconstitutionality" of the original ordinance in the recitations preceding their passage of the amended ordinance. However, there are other considerations affecting this court's conclusion of the existence of bad faith prosecution which are of more weight.

The following colloquy between the court and the Honorable S. M. Adams, City Attorney of Nacogdoches, is quoted from the record:

> THE COURT: * * * Perhaps the City Attorney, who is present here in court, may tell me what the disposition of the city is toward any prosecu-

tion that might be contemplated against the Plaintiff at this time.

MR. ADAMS: Judge, I can speak now for that as City Attorney. I have been in contact, not recently but some time ago, with the County and District Attorney, and I was abiding their decision in the matter.

THE COURT: You are going to do whatever they do?

MR. ADAMS: Yes, sir.

A reference to the testimony of the District Attorney and the County Attorney, taken by deposition at the request of the Court, is revealing. The District Attorney, the Honorable David Adams, testified that he had no role, function, responsibility, or duties in the County Court of Nacogdoches County; that he prosecuted only in the District Courts; and that he had not presented to any grand jury any case of felony grade against McGuire for indictment, and knew of none to present.

The following are extracts from the testimony of the Honorable Bryan Davis, County Attorney of Nacogdoches County:

[Questions by Mr. Watts, attorney for the plaintiff:]

Q. How long have you been County Attorney of Nacogdoches County, Texas?

A. Since 1966.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Are you the prosecutor in the County Court of Nacogdoches County?

A. Yes, sir.

Q. And those complaints [against McGuire], if they are to be prosecuted, are to be prosecuted by you. Is that correct?

A. Yes, I have sole responsibility for that.

Q. Have those complaints been dismissed, at this time?

A. No.

Q. Are those complaints still active, pending trial?

A. Yes, they are.

Q. What are your responsibilities and duties regarding the calling of cases for trial in the County Court of Nacogdoches County?

A. I have no responsibility, of course, for setting the docket of the court.

Q. Who sets the docket?

A. The judge, the County Judge.

Q. Has that been true since May 14th of 1970?

A. Yes.

Q. And who is the County Judge of Nacogdoches County, Texas?

A. The County Judge is Carl S. Burrows.

Q. And do you know how long Carl Burrows has been County Judge in Nacogdoches County?

A. He has been in approximately two years. Two years this January.

Q. Did he become County Judge of Nacogdoches County, pursuant to a run-off election held in June of 1970?

A. He did.

Q. And it is his sole responsibility to select the cases that will be placed upon the trial docket and to call those cases for trial in Nacogdoches County Court?

A. Yes.

Q. Do you know what the intentions are of the Court, at this time, for calling the five complaints lodged against Mr. McGuire, in that Court are, regarding trial or disposition of those causes?

A. No, sir. I do not, so far as being able to speak for the Court. What the Court's intentions are in the matter, I couldn't say.

Q. What are your intentions regarding those complaints?

A. My intentions at the present time are to treat them as I treat most of our other cases which are active pending cases on the docket. That is simply to, if asked by the Judge what my opinion is about

setting them, I would give him my opinion.

Q. What would your opinion be if he were to inquire?

A. My opinion at this time would be . . . my personal opinion would be that it would serve no good end at this time, to try the cases.

Q. Would it be your opinion or your recommendation to dismiss them?

A. No.

Q. It would be your recommendation to simply hold them in abeyance until you felt the proper time had arrived for trial of those cases?

A. Yes, sir.

\* \* \* \* \* \*

Q. I would like to ask you this, since you testified a moment ago when Mr. Potter asked you the question regarding whether or not a fair and impartial trial could have occurred, immediately succeeding the filing of these complaints against Mr. McGuire, in the County Court and you said it was your opinion because of the air of emotionalism that prevailed at that time—let me ask you this, do you think that that same attitude of emotionalism prevails at this date?

A. Since Mr. McGuire has removed himself from our midst, I don't feel that we have such tension as we had then. I think that we have a good deal left. I am not satisfied yet that there is such an absence of it that at this time, I would want to try the cases.

Judge Burrow's testimony was also taken by deposition at the direction of this court. A portion of it is as follows:

[Questions by Mr. Watts, attorney for plaintiff:]

Q. You have one week for criminal trials per each 4-months session.

A. Yes, sir.

Q. And you have been County Judge now since January the 1st, 1971.

A. Right.

Q. To your knowledge, have any of these five criminal charges pending against Mr. McGuire been set for trial in County Court?

A. No.

Q. Have they ever been placed on any docket, any criminal docket in County Court?

A. You mean before I went in there?

Q. Since you have taken office?

A. No.

Q. Now, who in the County Court's office, either the clerk's or your office as County Judge, designates which criminal cases will be set for trial during the sessions per year?

A. Me and the County Attorney.

Q. The County Attorney participates in that with you.

A. Yes.

Q. Does he actually take the lead or do you take the lead?

A. Well, both of us.

Q. You consult with him which cases should be tried?

A. Yes.

Q. Have you had occasion to consult with him about setting any of these five cases charged against Mr. McGuire for trial?

A. No. Let me tell you something. When I went in office in 1971, there was a large backlog of cases on the docket. There hadn't been over a dozen cases tried in County Court in the last eight years.

Q. Are you saying that these cases pending against Mr. McGuire have not been set for trial because of the backlog?

A. We haven't caught up to them.

Q. When do you expect to catch up to them?

A. Maybe this Fall.

Q. Do you have plans at this time for setting these cases for trial?

A. No specific plans.

[Questions by Mr. Potter, attorney for defendants:]

Q. Now, you have been asked by counsel when do you anticipate setting these cases. What do you intend to do about setting these cases? I'm asking you the same question.

A. I would like to try these cases some time this year.

Q. Now, Judge Burrows, do you appreciate that a defendant is entitled to have his case tried?

A. Oh, yes.

Q. Are you an attorney?

A. No.

Q. You do understand that a defendant is entitled to have his case tried?

A. Yes.

Q. And you say you would like to try them this year?

A. Yes.

Q. Well, do you propose to do it this year?

A. Well, if it is agreeable with the County Attorney.

Q. In other words, you are the judge of the court and you are the one to say whether you are going to try the case, or not. What if it is not agreeable with him? Are you going to try the cases this year?

A. If he is not agreeable and wouldn't, how could I?

Q. Well, you can either try cases or you can dismiss them. You can dispose of the case, you see. Are you going to set the cases down and try them?

MR. WATTS: Let the witness say what he's going to do.

A. Yes, I will set them down.

Q. I mean do you intend to set the cases down this year?

A. Yes.

Q. Now, when they are set down, at that time if the County Attorney is not ready, and I'm not asking you to pre-judge them or to say now what you are going to do at that time, but if you do set them down this year, will you decide at that time whether you are going to put the County Attorney to trial whether he wants to try them, or not. Otherwise, I want you to have this advise: That it is for the Judge to decide what he is going to do with the case when he sets it for trial and not the County Attorney.

A. Well, knowing the County Attorney like I do and the respect I have for him, I think he would respect my wishes enough to try the cases.

■ It is implicit from the statement of the County Attorney and the foregoing testimony that the City Attorney and the County Attorney entered into an agreement, tacit or otherwise, that so long as McGuire absented himself from Nacogdoches, neither would make any effort to bring him to trial, and this court so finds. Assuming McGuire's continued nonpresence in Nacogdoches, it is doubtful that the County Court prosecutions directed against him would ever have occurred, taking into account the fact that the lay County Judge was not cognizant of his power to set and to try cases without the concurrence of the County Attorney. Hence, it is this court's opinion that the bona fides of the prosecutions against McGuire in the County Court is subject to question.

■ But regardless of the status of the prosecutions in County Court, the question before the court at this juncture is whether the prosecution in Corporation Court is being conducted in good faith. The City Attorney advanced no explanation or rationalization for his determination that he would abide by the decision of the County Attorney and the District Attorney respecting McGuire's continued prosecution in the Corporation Court, nor is this court able

to perceive any valid reason or justification for his decision. On the contrary, this court finds that the City Attorney is fully aware of the constitutional invalidity of the original procession ordinance, and that the purpose and effect of his failure to move for the dismissal of the charge against McGuire was and is to intimidate, threaten and coerce other blacks from exercising their constitutional rights to free speech and assembly. Duncan v. Perez, 321 F.Supp. 181, 184–185 (E.D.La.1970), aff'd 445 F.2d 557 (5 Cir. 1971); United States v. McLeod, 385 F.2d 734, 744–745 (5 Cir. 1967).

 Considering the glaring and evident unconstitutionality of the ordinance of August 9, 1965, and the bad faith prosecution of McGuire in the Corporation Court, the prerequisites of Samuels v. Mackell, *supra,* have been met, and a declaration of the invalidity of the ordinance is proper. There is still left for resolution, however, the other contentions of the defendants.

Defendants argue that this action has been mooted, because: (1) McGuire no longer resides in Nacogdoches; (2) McGuire is not now an organizer for the National Black Students Association; (3) Nacogdoches is now quiet and orderly, there having been no demonstrations on its streets or sidewalks since McGuire left the city; and (4) a new ordinance relating to processions was adopted by the City Commission of the City of Nacogdoches on September 22, 1971.

 The finding of a bad faith prosecution establishes irreparable injury to McGuire, both great and immediate, for purposes of the comity restraints discussed in *Younger.* Shaw v. Garrison, 467 F.2d 113 (5 Cir. 1972). This harm to McGuire remains impendent and unsoftened, regardless of his present residence or occupation, and without respect to the present state of public order in Nacogdoches. It is thus unrealistic to assert that the controversy is moot as to McGuire.

 Furthermore, with reference to the third argument, it should be noted that this action is maintainable as a class action, the members of the class being those persons in Nacogdoches who desire to demonstrate lawfully on the streets of that city in behalf of civil rights for blacks. Jenkins v. United Gas Corp., 400 F.2d 28, 34 (5 Cir. 1968). See also: Advisory Committee's Note to Subdivision (b)(2), of 23 F.R.Civ.P., and cases there cited.

"[T]he class suit is a uniquely appropriate procedure in civil rights cases, which generally involve an allegation of discrimination against a group as well as the violation of rights of particular individuals. Moreover, by their very nature civil rights class actions almost invariably involve a plaintiff class.

\* \* \* \* \* \*

"The doctrine of mootness is tied to the concern that once a plaintiff loses his right to relief the court, in effect, will be rendering an advisory opinion if it continues since no actual controversy is before it. But this reasoning does not apply in the class action context, because the fact that some members of the class no longer are subject to the alleged discrimination does not destroy the existence of a controversy between defendant and the remaining class members. Indeed, to hold otherwise would enable defendant to circumvent the public policies against discrimination on the grounds of race or sex by 'buying off' or satisfying individual claimants." Wright & Miller, Federal Practice and Procedure: Civil Sec. 1776.

To hold otherwise would, under certain circumstances, also enable a defendant to "scare off" an individual plaintiff.

 The circumstances of this case —the history of systematic racial discrimination in Nacogdoches; the harsh measures employed by the police and other officers to break up the march of May 13, 1970; the filing of numerous

criminal complaints against the chief actor, McGuire, by city police; the bad faith prosecution of McGuire by the City Attorney; the evident agreement between the prosecuting attorneys for the City and State to hold criminal charges over McGuire's head, to induce him to refrain from returning to Nacogdoches; the personal hostility evidenced by the Chief of Police toward McGuire and other black militants; and, finally, the fact that no further marches on the streets of Nacogdoches have occurred, although blacks and students in Nacogdoches continue the civil rights ferment [13]—all compel the conclusion and finding of this court that enforcement by the City of the unconstitutional ordinance of August 9, 1965, has effectively and continuously operated to intimidate, deter, and inhibit, and presently intimidates, deters, and inhibits, the affected class from exercising their rights, under the First and Fourteenth Amendments, to free speech and assembly on the streets of Nacogdoches. Duncan v. Perez, *supra*, 321 F.Supp., at 184–185, 445 F. 2d, at 560; United States v. McLeod, *supra*, 385 F.2d at 744–745.

The rights of the affected class are not in issue in McGuire's prosecution in the Corporation Court, and remedies available to him in his trial are in no way available to the affected class. Neither could the rights of the non-litigants in the criminal trial be represented in the state appellate process or by direct Supreme Court review. In view of these considerations, irreparable injury to the affected class is present here. Duncan v. Perez, *supra*, 321 F.Supp., at 185, 445 F.2d, at 560; United States v. McLeod, *supra*, 385 F.2d, at 746–747; United States v. Wood, 295 F.2d 772, 781 (5 Cir. 1961). *Cf.* Dombrowski v. Pfister, 380 U.S. 479, 486, 85 S.Ct. 1116, 14 L. Ed.2d 22 (1965); Reed v. Giarrusso, 462 F.2d 706 (5 Cir. 1972). To hold otherwise would mean that "free expression —of transcendent value to all society, and not merely to those exercising their rights—might be the loser." Dombrowski v. Pfister, *supra*, 380 U.S., at 486, 85 S.Ct., at 1121.

As previously indicated, defendants base their final argument as to mootness on the fact that on September 22, 1971, after this suit was instituted, the City Commission of Nacogdoches voluntarily adopted an amended ordinance governing street and sidewalk processions. The terms of the amended ordinance are set forth in the margin.[14] The defendants maintain the constitutionality of

---

13. In addition to Civil Action No. 5524, Weaver v. Muckleroy (referred to in footnote 3), Civil Action No. 5534, Brown v. Burrows, has been filed in the Tyler Division of this court. Numerous of the allegations in the complaint relate to discriminatory practices and cruel treatment directed toward blacks confined in the Nacogdoches County Jail.

14. "WHEREAS, it has been brought to the attention of the City Commission of the City of Nacogdoches that there is a possibility of the unconstitutionality of Section 21–37 of the Code of Ordinances of the City of Nacogdoches as amended on August 9, 1965, and

"WHEREAS, it is the desire of the City of Nacogdoches that Section 21–37 of the Code of Ordinances of the City of Nacogdoches be now amended to eliminate any possibility of it being unconstitutional.

"NOW, THEREFORE, BE IT ORDAINED by the City Commission of the City of Nacogdoches that Section 21–37 of the Code of Ordinances of the City of Nacogdoches be amended so that same shall henceforth read as follows:

"Section 21–37. Same—When permit required.

"No procession, march or demonstration (excepting the military forces of the United States and funerals) shall occupy, march or proceed on any street or sidewalk except on application and in accordance with a permit issued by the City Manager who prior to granting or refusing such permit, shall make the investigation hereinafter referred to. The decision of the City Manager may be appealed to the City Commission; such appeal may be perfected by notice in writing given by any interested party addressed to the City Secretary, who shall place such appeal on the agenda of the next regular or special meeting of the Commission, and the same shall be promptly heard by the Commission. The permit shall be granted by the City Manager, or by the Commission on appeal,

the amended ordinance, and argue that the action of the City Commission in voluntarily adopting it demonstrates that the City will hereafter follow constitutional procedures in granting or denying permits for processions. But, as stated in United States v. W. T. Grant Co., 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953):

> "[V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i. e., does not make the case moot. * * * A controversy may remain to be settled in such circumstances, . . . e. g., a dispute over the legality of the challenged practices. * * * The defendant is free to return to his old ways. This, together with the public interest in having the legality of the practices settled, militates against a mootness conclusion. * * * For to say that the case has become moot means that the defendant is entitled to a dismissal as a matter of right. * * * The courts have rightly refused to grant defendants such a powerful weapon against public law enforcement." (Citations omitted.)

In this regard, the defendants have adamantly and consistently asserted that the ordinance of August 9, 1965, is constitutional, although closely pressed by the court to admit the contrary. This obstinate and obdurate attitude on the part of the defendants emphasizes that, "[w]hat has been adopted can be repealed." Anderson v. City of Albany, 321 F.2d 649, 657 (5 Cir. 1963). *Cf.* Bailey v. Patterson, 323 F.2d 201, 205 (5 Cir. 1963). Moreover, "[i]t is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform especially when abandonment seems timed to anticipate suit, and there is probability of resumption." United States v. Oregon State Medical Society, 343 U.S. 326, 333, 72 S.Ct. 690, 696, 96 L.Ed. 978 (1952). If past history is a guide to future conduct, the Nacogdoches police will probably be permitted to enforce the amended procession ordinance, even though its constitutionality may legitimately be called into question.

The court is not empowered to make a declaration of the constitutionality *vel non* of the amended ordinance, because there are no pending or threatened criminal prosecutions under it. Becker v. Thompson, 459 F.2d 919 (5 Cir. 1972). However, in view of the defendants' profession that the adoption of the amended ordinance has had the effect of mooting this action, the court has made a preliminary examination of the validity of defendants' contention.

In Shuttlesworth v. Birmingham, *supra,* 394 U.S. 147, at 162, 89 S.Ct. 935, at 944, Justice Harlan makes reference to "the principle established in Freedman v. Maryland, 380 U.S. 51, 58–61, 85 S.Ct. 734, 738–741, 13 L.Ed.2d 649 (1965), which prohibits the States from requiring persons to invoke unduly cumbersome and time-consuming procedures before they may exercise their constitu-

---

unless after investigation by the City Manager he finds that the granting of same will unduly disturb the convenience of the public in the use of the streets. The finding by the City Manager is subject to review by the Commission. The permit, if granted, shall be upon such conditions or changes in time, place and manner *as would avoid disturbance yet reasonably allow the legal purposes* of the applicants. The act of the Commission is subject to review by a Court of competent jurisdiction to the extent provided by law.

"BE IT FURTHER ORDAINED by the City Commission of the City of Nacogdoches that this amendment be passed as an emergency and any requirement that same be read at more than one meeting of the City Commission is hereby waived, and said amendment is passed as an emergency.

"PASSED AND APPROVED unanimously this 22nd day of September, 1971.

"ATTEST:

/c/ Cleon Compton
Cleon Compton, City Secretary

/s/ R. G. Muckleroy, Jr.
R. G. Muckleroy, Jr.
Chairman, City Commission"

tional right of expression." [15] See also: Teitel Film Corporation v. Cusack, 390 U.S. 139, 88 S.Ct. 754, 19 L.Ed.2d 966 (1968).

It is to be observed that no "specified brief period", Freedman v. Maryland, *supra*, 380 U.S., at 59, 85 S.Ct. 734, within which the City Manager must make the investigation and determination of whether the granting of a permit "will unduly disturb the convenience of the public in the use of the streets" is prescribed by the amended ordinance. In the event of an adverse decision by the City Manager, a right of appeal to the City Commission is given to the ap-

plicant; but, again, no specified brief period for action by the City Commission on the appeal is required. The only particularization is that "the City Secretary . . . place such appeal on the agenda of the next regular or special meeting of the Commission, and the same shall be promptly heard by the Commission." [16] This somewhat vague language does not appear to comport with the specificity demanded by *Freedman* and *Cusack*.

It should also be noted that the amended ordinance "makes no provision for prompt, Commission-initiated judicial review." LeFlore v. Robinson, 434 F.2d 933, 948 (5 Cir. 1970).[17]

15. In his concurring opinion in *Shuttlesworth, supra*, 394 U.S., at 163, 89 S.Ct., at 945, Justice Harlan stated:

"I do not mean to suggest that a State or city may not reasonably require that parade permit applications be submitted early enough to allow the authorities and the judiciary to determine whether the parade proposal is consistent with the important interests respecting the use of the streets which local authority may legitimately protect. But such applications must be handled on an expedited basis so that rights of political expression will not be lost in a maze of cumbersome and slow-moving procedures."

16. Compare Stacy v. Williams, 306 F. Supp. 963 (N.D.Miss.1969) (three-judge court), where the District Court found it necessary to promulgate regulations for off-campus speakers applicable to all institutions of higher learning in Mississippi. The court stressed the necessity "that procedural due process be built into such . . . regulation[s]," citing Freedman v. Maryland, *supra*, and Teitel Film Corporation v. Cusack, *supra*. *Id.* at 973. A significant provision was that "[A]ny request [for the issuance of an invitation to an outside speaker] not acted upon by the head of the institution . . . within four days after submission shall be deemed granted." *Id.* at 979. It was further provided that "[w]here the request for an outside speaker is denied, any sponsoring organization thereby aggrieved shall, upon written aplication to the head of the institution . . . obtain a hearing within two days following the filing of its appeal before a Campus Review Committee . . . ." The regulations also stipulated that "[i]f

such request is neither granted nor denied [by the Campus Review Committee] within such two-day period, it shall be deemed granted . . . ."

The time limitations there prescribed appear to be lengthy, when compared to the statutory model referred to by Justice Brennan in Freedman v. Maryland, *supra*, 380 U.S., at 60, 85 S.Ct. 734.

Article 527, § 13, Vernon's Ann.Penal Code, which relates to the issuance of injunctive relief as to allegedly obscene material, is obviously based on the time limits mentioned in *Freedman*. In pertinent part, the Texas statute reads:

"[No] restraining order or injunction shall issue except on notice to the person sought to be enjoined. Such person shall be entitled to a trial on the issues within one day after joined of issue and a decision shall be rendered by the court within two days of the conclusion of the trial."

17. There are no Texas statutes relating to expeditious review of First Amendment controversies, aside from Article 527, quoted in the preceding footnote. This calls to mind Justice Harlan's observation in his concurring opinion in Shuttlesworth, 394 U.S., at 162, 89 S.Ct., at 944:

"The right to assemble peaceably to voice political protest is at least as basic as the right to exhibit a motion picture which may have some aesthetic value."

In Teitel Film Corporation v. Cusack, *supra*, 390 U.S., at 142, 88 S.Ct., at 756, it was held that:

"The absence of any provision for a prompt judicial decision by the trial court violated the standard that . . . the procedure must also assure a prompt final judicial decision . . . ."

"A majority of the Supreme Court has yet to delineate explicitly the relevance of *Freedman* to the permit-granting process . . .", LeFlore v. Robinson, *supra*, 434 F.2d, at 947; but enough has been said by the Supreme Court to foretoken that *Freedman* is likely to be the rule of decision in such cases. Shuttlesworth v. Birmingham, *supra*, 394 U.S., at 155, fn. 4, 89 S.Ct. 935. Consequently, the substantiality of the defendants' claim that the adoption of the amended ordinance moots this action seems to be, at best, disputable.

In addition to their allegations that this suit is moot, defendants claim, alternatively, that plaintiffs lack standing to bring it.

"If the court finds that the representative [in a class action] actually has been harmed or affected by the challenged conduct or regulation, then he has standing. On the other hand, if the court determines that he is a mere volunteer, and is not personally aggrieved, he will not be allowed to maintain the suit. * * * The standing requirement has not been rigidly applied, however, so if plaintiff can show that there is some possibility he may be affected in the future, the court will hold generally, that he may bring the action." Wright & Miller, Federal Practice and Procedure: Civil Sec. 1776.

Considering the findings of this court, it is entirely apparent that McGuire and the members of the class he represents have been harmed and affected by the ordinance. The standing of the named plaintiff, McGuire, and the remaining members of the class to bring the suit is, therefore, confirmed. Reed v. Giarrusso, *supra*; Bailey v. Patterson, 323 F.2d 201 (5 Cir. 1963); Smith v. Y.M.C.A., 316 F.Supp. 899, 903 (M.D.Ala. 1970); Washington v. Lee, 263 F.Supp. 327, 329–330 (M.D.Ala.1966) (three-judge court), affirmed per curiam, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968).

Accordingly, Ordinance No. 21–37, passed and approved by the City Commission of the City of Nacogdoches on August 9, 1965, being in violation of the First and Fourteenth Amendments, is hereby declared to be unconstitutional.

It is ordered that the defendant members of the City Commission and their successors in office be, and they are hereby, restrained and enjoined from re-enacting such ordinance.